UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT WOJCIECHOWSKI and
SHERI WOJCIECHOWSKI
        Plaintiffs,                Case No.: 8:14-cv-03176-MSS-TB

v.

ALLSTATE PROPERTY AND
CASUALTY INSURANCE,
        Defendant.
_____/

## DEFENDANT'S DAUBERT MOTION TO EXCLUDE
## THE OPINIONS OF MARK ROMANO

Defendant, ALLSTATE PROPERTY AND CASUALTY INSURANCE ("Allstate"), pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), moves the Court for entry of an Order excluding the opinions of Plaintiff's expert, Mark Romano, and as grounds therefore states:

## A.  BACKGROUND FACTS[1]

On June 23, 2010 Plaintiff was involved in a motor vehicle accident allegedly caused by Gabrielle Granata, who was insured for bodily injury liability under a policy through Kemper in the amount of $100,000 per person.  Plaintiff had in effect an automobile insurance policy through Allstate, with per person UIM policy limits of $100,000.

Mr. Castagliola made a claim on behalf of Mr. Wojciechowski by sending a dual demand (dated November 18, 2011) to both Kemper and to Allstate, requesting payment of the tortfeasor's $100,000 bodily injury liability policy limits, as well as payment of Allstate's $100,000 in UIM benefits.  *See* Dkt. 12-3; *see also* Complaint at Dkt. 1, ¶ 18.

---

[1] For a detailed review of the factual background of the case, see Defendant's Motion for Summary Judgment filed herein, dated March 18, 2016, Dkt.38.

As part of the process of evaluating the demand package, in December 2011, Carol Rhodes, a temporary adjuster assisting Ms. Desenti,[2] utilized "Colossus," a software program used in the process of claim valuation by Allstate adjusters, inputting data based on the statements and medical records provided by Mr. Castagliola.   In addition to the Colossus assessments run by temporary adjuster Carol Rhodes over a 10 day period, an evaluation was conducted by Carolyn Mitchell (Allstate's Evaluation Consultant). (*See* Dkt. 38-14). Based on the collective evaluation, Ms. Desenti wrote to Mr. Castagliola, stating that Allstate would not be making an offer and outlining some of the reasons why. (*See* Dkt. 38-14). The letter also stated that Allstate remained willing to review any additional information that Mr. Castagliola submitted on behalf of his client.  (*See* Dkt. 38-14).

In January 2013, Mr. Wojciechowski returned to Dr. Pigeon for treatment (*See* Dkt. 38-19) and ultimately underwent cervical surgery on May 29, 2013.   Mr. Castagliola provided updated medical information to Allstate via letter dated June 7, 2013.  (*See* Dkt. 38-20) After receiving the updated medical information, which potentially increased the value of Mr. Wojciechowski's claim, Mr. Prevot re-evaluated Mr. Wojciechowski's claim.  As part of Mr. Prevot's evaluation, he ran another Colossus assessment. (*See* Dkt. 38-21)   Although the Colossus assessment valued the claim at $0 after the $100,000 set-off for the tortfeasor's policy limits already paid out, Mr. Prevot ultimately determined to offer the policy limits because at the time of his review, Plaintiff's case had an arguable value at the UIM policy limits and that it was best to go ahead and try to resolve it, as opposed to continuing to defend.   (*See* Dkt. 42, Deposition of Steve Prevot, taken January 14, 2016, at p. 151, lines 13-16; p. 175, lines 18 – 21).

---

[2] Carol Rhodes was assisting Ms. Desenti because, at this time, Ms. Desenti was transitioning to a different unit within Allstate and she was training another adjuster to assume her claims.  *See* Dkt. 40, Deposition of Michelle Desenti, tajen November 16, 2015, at page 58, line 24 – page 59, line 5; p. 60, lines 23 -25.

B. <u>SUMMARY</u>

Mr. Romano worked at Allstate from 1999 to 2008.  He was employed in the Allstate Home Office located in Northbrook, Illinois, and his responsibilities included assisting with "tuning" Colossus on certain limited occasion,.  See id.  The Colossus system is merely one tool used by claim adjusters in the evaluation of claims.  So while Mr. Romano may have some knowledge regarding how the Colossus system was tuned on a national level at the time he was employed by Allstate, that does not translate to specialized knowledge as to how claims in Florida are to be handled on the whole based on Florida standards and whether Allstate acted in accordance with those standards in this case.

Further, the underlying accident took place on June 23, 2010 and the material time period in which Colossus was utilized in this specific case was from December 2011 through June 2013.  Therefore, any knowledge he may have acquired regarding Colossus during his employment was outdated and irrelevant to how Colossus may have been tuned at the material time period.  The tuning of Colossus and surrounding issues raised in Mr. Romano's report are irrelevant to whether Allstate handled the underlying claim in good faith as there is no causal connection between Mr. Romano's understanding of the Colossus tuning process and the alleged "failure to settle within policy limits" in this matter.

Under these circumstances, Mr. Romano should be prohibited from testifying as an expert in this matter because he is not qualified to provide an expert opinion on Florida insurance claim handling; his opinions regarding Colossus are not relevant to any issues of fact in this matter; his opinions are not based on a reliable foundation; and any potential relevance of Mr. Romano's opinion are substantially outweighed by the unfair prejudice of Mr. Romano's speculative opinions as to Allstate's motivations.

### C. <u>DAUBERT STANDARD GENERALLY</u>

*Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) governs the issue of whether Mr. Romano should be allowed to testify as an expert on insurance good faith claims handling in Florida.  In order to be admissible, *Daubert* requires that the proffered testimony:

    A.  be proffered as expert testimony;

    B.  by an expert qualified by knowledge, skill, training or education;

    C.  on a topic that is relevant to the issues of fact;

    D.  which is based upon

        a.  sufficient data or facts;

        b.  a reliable foundation;

        c.  the product of reliable principles;

        d.  applied reliably to the facts of the case;

    E.  that will assist the trier of fact;

    F.  so long as its probative value that is not substantially outweighed by unfair prejudice under 90.403.

*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 589 n.7, 597. As a gatekeeper, this court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593-94. The Supreme Court has made it clear that *Daubert's* gate-keeping obligation applies to all expert testimony, not just scientific experts, and "reemphasized that an expert, whether basing testimony upon professional studies, or

personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The Supreme Court set forth the following factors that are to be considered in determining the reliability of scientific expert testimony:

1. whether the expert's technique or theory can be or has been tested;

2. whether the technique or theory has been subject to peer review and publications;

3. the known or potential rate of error of the technique or theory when applied;

4. the existence and maintenance of standards and controls; and

5. whether the technique or theory has been generally accepted in the scientific community.

*Daubert*, 509 U.S. at 593-94; *Andrew v. Metro North Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) ("For an expert's testimony to be admissible … it must be directed to matters within the witness's scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help.").

Other factors a court may consider include the following: 1) whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinions expressly for the purposes of testifying; 2) whether the expert formed his opinion and then looked for reasons to support it rather than research that led him to his conclusion; 3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; 4) whether the expert has adequately accounted for obvious alternative explanations; 5) whether the expert is being as careful as he would be in his professional work outside his paid litigation consulting; and 6) whether the field of expertise claimed by the expert is known to reach reliable results for

the type of opinion the expert would give. *See Kumho Tire*, 526 U.S. at 151; *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535-36 (7th Cir. 2005); Fed. R. Evid. 702, advisory committee's note (2000 amendments). "For an expert's testimony to be admissible … it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrew*, 882 F.2d at 708 (citations omitted). The burden is on the party offering the proposed expert opinion testimony to prove by a preponderance of the evidence that the testimony satisfies the requirements for admissibility. *Daubert*, 509 U.S. at 592 n. 10.

If a witness fails to submit any expert report or opinions, "disclose any data, methodology, or reasoning, that would substantiate or form the basis for the testimony" that person can be excluded from testifying under the *Daubert* Standard because it is not reliable. *Barnes v. BTN, Inc.*, 555 F. App'x 281, 284 (5th Cir. 2014), *as revised* (Feb. 10, 2014) (relying on *Daubert* to strike to witnesses from testifying about a loss of wages, present value of damages, medical expenses, life care plan, and loss of earning capacity).

An expert for one purpose is not an expert for all purposes. Accordingly, not all opinions that happen to be held by an expert are "expert opinions." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). Opinions falling outside the expert's area of expertise are inadmissible. *Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995) (affirming exclusion of neurologist's testimony "that the [plaintiff's neck] injury was more consistent with being thrown into a wall than with a stumble into the corner"); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339-40 (7th Cir. 1989) (rejecting economist's opinion that defendant's conduct "was contrary to good faith and fair dealing").

Likewise, although an expert is allowed to render an opinion regarding an ultimate issue in a case, he is not permitted to render an opinion that applies a legal standard to a set of facts. *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n. 20 (9th Cir. 2002). An expert is not allowed to testify as to the legal implications of conduct; the court must be the jury's only source of law. *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (an expert is not permitted to opine that a party had a duty to hire a tax counsel in a case as such opinion was an inadmissible legal conclusion). "The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury." *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985); *Kearney v. Auto-Owners Ins. Co.*, 2009 U.S. Dist. LEXIS 108918 (M.D. Fla. 2009) (an expert cannot testify that an insurance carrier "acted in bad faith" as that would be an inadmissible legal conclusion).

## D. MR. ROMANO IS NOT QUALIFIED AS AN EXPERT ON GOOD FAITH INSURANCE PRACTICES IN FLORIDA

Mr. Romano has couched his testimony as "opinions," based upon generic claims experience and his particular experience with a software program utilized by Allstate as part of its claim handling process, though the extent of his experience with insurance claims handling and bad faith law in Florida is unclear.  This bad faith claim involves a claim that arose in Florida, was adjusted in Florida pursuant to an insurance policy issued in Florida to a resident of Florida.  There is no question the material issue of whether Allstate fulfilled its duties of good faith to Plaintiff must be determined based upon accurate claims adjustment standards in Florida, based on sufficient experience in Florida.  According to his resume, he worked as a "Multi-Line Claim Representative" in St. Petersburg, Florida for an insurer from 1982-1986 and as a "Supervising Adjuster" from 1986-1996 in Tampa, Florida and St. Louis, Missouri, but it is unclear at what point he worked in which state in that time period.  After 1996, he worked in

New York and Illinois.  It appears Mr. Romano is neither approved nor has he presented training approved by the Florida Department of Insurance to licensed adjusters and has not provided guidance to Florida adjusters for Continuing Education Credit on how to fulfill their obligations to their insureds.

Under these circumstances, Mr. Romano lacks sufficient knowledge, skill, or training regarding an insurer's good faith claims practices in Florida to qualify him as an expert on same. His resume does not include the type of bad faith claims handling experience found to qualify an insurance bad faith expert in cases such as *Camacho v. Nationwide Mut. Ins. Co.*, 13 F. Supp. 3d 1343, 1368-69 (N.D. Ga. 2014), where the expert had been "employed with Aetna for 12 years as an insurance claims adjuster and senior technical representative assisting with the resolution of complex litigation including bad faith claims and as an auditor of proper claims handling under industry standards" and "as a manager in Infinity's corporate litigation department for 15 years where he was responsible for the nationwide evaluation of bad faith litigation, served as Infinity's company's 30(b)(6) trial witness, developed and wrote company best practices for claims handling to meet insurance standards, taught claims handling practices to field staff, directed company compliance for claims handling, and developed a library for bad faith, good faith and fair dealing handling of claims, among other duties." *Id*. at 1368.

The contrast between the experience of an expert qualified to opine on insurance good faith claims practices and the lack of experience in the area on Mr. Romano's part is stark.  Mr. Romano cannot be qualified to render opinions in this bad faith matter.   Further, although the Colossus knowledge Mr. Romano claims to possess is not relevant to this case (discussed below), even if it was, Mr. Romano cannot be said to be an expert on those issues, either, as the alleged knowledge he gained through his employment with Allstate was not based on current

information from the material time frame.  All of Mr. Romano's opinions should be excluded as unqualified.

### E.  ROMANO'S OPINIONS ARE NOT RELEVANT TO ANY MATERIAL ISSUES OF FACT

Additionally, Mr. Romano's opinions do not fit the facts of this case. In order to "fit," expert testimony "must have a traceable and analytical basis in objective fact." *Bragdon v. Abbott,* 524 U.S. 624, 653, 118 S. Ct. 2196, 141 L.Ed.2d 540 (1998). Mr. Romano's testimony regarding claim handling generally is based upon an unidentified, nebulous standard that he has created from whole cloth and his conclusions are not applicable to the issues presented in this case. Therefore, Mr. Romano's conclusions do not "fit" the issues in this case. *See Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc.*, 546 F. Supp. 155, 177 (D.N.J. 2008).

Mr. Romano's testimony is based primarily on his opinions of the Colossus system, which is of no material relevance in this matter, even if Mr. Romano's opinions of the Colossus system were based on knowledge of the Colossus system as it existed during the material time (which Mr. Romano's opinions are clearly not).    It is undisputed that Florida law applies a "totality of the circumstances" standard to test bad faith cases,[3] however, in order to be considered as part of the totality of the circumstances, the material must still be ***relevant***.[4]  Mr. Romano's testimony concerning Colossus is not relevant.

---

[3] *See e.g. Berges v. Infinity Ins. Co.,* 896 So. 2d 665, 680 (Fla. 2004).

[4] *See, e.g. Barry v. GEICO*, 938 So. 2d 613 (Fla. 4th DCA 2006) (citing *Powell v. Prudential Prop. & Cas. Ins. Co*., 584 So. 2d 12 (Fla. 3d DCA 1991); *Mendez v. Unitrin Direct Prop. & Cas. Ins. Co.*, No. 8:06-cv-563-T-24MAP, 2007 WL 2696795 (M.D. Fla. Sept. 12, 2007), and *Kemm v. Allstate Prop.& Cas. Ins. Co*., No. 8:08-cv-299-T-30EAJ, 2009 WL 1954146 (M.D. Fla. July 7, 2009) (all where the court first determined whether a fact or allegation was relevant, before permitting it to be considered as part of the "totality of the circumstances"); *Golphin v. State of Fla.*, 945 So. 2d 1174, 1197 (Fla. 2006) (explaining "totality of the circumstances" standard in an analogous context of search and seizure, and stating "the totality of the circumstances test 'does not mean that each and every circumstance in the case must be assumed to have the same degree of relevance and weight.'  There are times when

First, the undisputed evidence shows that this computer program had no impact on Allstate's evaluation of Plaintiff's claim. Allstate used the Colossus software on five occasions during the consideration of Plaintiff's claim. The undisputed facts show that in each instance, the Colossus output did not materially affect Allstate's position.  In fact, when Allstate did offer the policy limits, the Colossus run by Mr. Prevot continued to maintain a value of zero.  (*See* Dkt. 38-21)  Mr. Romano's theory that, twenty years ago before he was employed at Allstate, Colossus was deliberately set to generate settlement values that were 20% too low simply has no causal nexus to the undisputed facts of this claim.  Where, as here, Colossus did not determine the value of the claim, courts have held that it is not relevant to whether the claim was handled in bad faith.  For example, in *Milhone v. Allstate*, 289 F. Supp. 2d 1089, 1101-1102 (D. Ariz. 2003) the court held that ***Allstate's use of Colossus could not support a bad faith claim where Allstate's offer was "slightly above" the Colossus range***.  As the Court explained, because the adjusters used their own judgment to evaluate the claim, any flaw in the Colossus system could be "overcome" by "a manual adjustment of the amount offered."  *Id*.  Accordingly, the court found that there was no causal nexus between "bad faith" allegations relating to alleged improper use of Colossus and plaintiff's own claim.  *Id*.; *see also*, *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp.2d 583, 595 (E.D. Pa. 1999) (rejecting claims of bad faith with respect to use of Colossus system where adjuster did not rely on the program in making his own settlement offer, but used his own judgment in determining the value of the case).  In this case, the testimony by the adjusters was that Colossus was simply a tool used as part of the evaluation of claims, and certainly not the only tool.

---

one circumstance among the totality converts what would otherwise be [a benign occurrence] into a [problematic one].").

Additionally, the Florida Office of Insurance Regulation – the state agency with primary jurisdiction to regulate Allstate's claims handling practices – has carefully examined and approved Allstate's use of the Colossus software.  The Florida Office of Insurance Regulation, along with the regulators from 44 other state and federal agencies, reviewed the same documents referenced by Mr. Romano and considered the same allegations about Colossus as Plaintiff (through Mr. Romano) makes here. After an examination that took over 8,500 hours of examiner time, review of over a million pages of documents, and review of data from nearly two million claims nationwide, the Florida Office of Insurance Regulation (and the regulators from 44 other state and federal jurisdictions) (a) approved Allstate's continued use of Colossus, and (b) did not identify any institutional issues involving underpayment of claims through the use of Colossus, either from the use of the Colossus software, or from the twenty year old Claim Core Process Redesign program. The examination was concluded in September 2010, so it covered the time period in which Mr. Romano was employed by Allstate on which his allegations are based.  The doctrine of primary jurisdiction precludes this Court from entertaining a challenge to a general practice that the Florida Office of Insurance Regulation has expressly approved and permitted.

The following description of the Colossus software is taken directly from the factual findings adopted by the Florida Office of Insurance Regulation in the Multi-State Market Conduct Regulatory Agreement ("MMCRA"), a copy of which is attached hereto as Exhibit 1:

> 2. The Colossus software program is a rule based program with approximately six hundred (600) injury profiles and is a tool Allstate adjusters use in evaluating general damages for certain bodily injury claims.
>
> 3. The Colossus software program is a systematic approach to investigating and evaluating injury claims that requires the adjuster to assemble and input detailed medical information into the software program. Through a series of menus and prompts, the Colossus software program solicits information and identifies inconsistencies for the adjuster

to consider concerning the injury, its treatment, results and prognosis and provides an extensive medical reference system.

4. Based on the information entered, the Colossus software program assigns trauma severity points to the injury. Determination of the relative severity of an injury is based on a set of approximately ten thousand (10,000) rules.

5. Trauma severity points range from zero to hundreds of thousands for the gravest of injuries. Once the Colossus software program assigns trauma severity points to an injury, the program generates a value, expressed as a range for general damages associated with that trauma severity, using a mathematical function or curve which maps trauma severity points to dollar amounts for general damages.

6. The Colossus software program is periodically modified or "tuned." Tuning is the process whereby recent settlement data is mapped onto trauma severity points, which updates the tuning curve described above. Therefore, the monetary value associated with trauma severity points is updated to reflect recent settlement data.

7. Allstate has conducted a nationwide tuning analysis of the Colossus software program approximately every twelve (12) to eighteen (18) months, and has completed this process in all tuning regions at least ten (10) times since initial implementation in 1995 and 1996. Allstate currently has one hundred nineteen (119) tuning regions, including at least one region for each state. Generally, where settlement values of similar claims vary by more than ten percent (10%), separate tuning regions within a state are created.

8. The Colossus software program does not assess or revise special damages, such as past or future medical bills, lost wages, or other out-of-pocket expenses. These items are manually entered by the adjuster. The program then adds these amounts to its recommendation for general damages.

9. The Colossus software program does not assess or revise liability issues, such as comparative negligence. Any percentage of comparative negligence is entered manually by the adjuster. The program then reduces its recommendation by that manually entered percentage.

10. The Colossus software program does not assess or revise offsets. Offsets are manually entered by the adjuster, and the program subtracts the manually entered offsets from its recommendation.

> 11. Allstate adjusters consider many factors that may affect the value of a claim such as aggravated liability issues, credibility of witnesses and questions relating to causation of a claimed injury.[5]

The Multi-State Market Conduct Regulatory Agreement ("MMCRA"), adopted and agreed to by the Florida Office of Insurance Regulation and the other participating regulators as the culmination of the examination, details the focus and unprecedented scope of the examination leading up to that Agreement:

> As directed by the Lead Regulators, the Examination focused primarily on Allstate's handling of bodily injury claims from the mid- 1990's to the present, including its use of computer systems to settle such claims. The Examination included a review of Allstate's use of claims handling software, particularly the Colossus software program licensed by Allstate from Computer Sciences Corporation ("CSC"), as a tool in determining payment amounts for claims, Allstate's training, performance evaluation and compensation of claims personnel, and Allstate's handling of bodily injury claims where the claimant was represented by an attorney ('attorney represented claims').[6]

The examination was

> designed to comprehensively review Allstate's bodily injury claims practices from the mid-1990's to the present, including a project undertaken by Allstate in 1993 and 1994, and implemented in 1995 and 1996, known as Claims Core Process Redesign ("CCPR") and the adoption and use of the Colossus software program.[7]

The examination was unprecedented in scope:

> The Examination was the first multi-state examination of a national personal lines carrier targeted toward the use of software technology tools in the claims handling process.[8]

The examination expressly included consideration of the allegations by other plaintiffs' attorneys on which Mr. Romano's testimony relies (and the same allegations Mr. Romano himself makes):

---

[5] MMCRA, ¶ ¶ II.B.2 through 11.
[6] MMCRA, ¶ I.A.
[7] MMCRA, ¶ I.B.1.
[8] MMCRA, ¶ I.J.

Included among the documents provided to and considered by the Examiner and the Lead Regulators were pleadings and documents in the actions in the District Court for Miller County, Arkansas, styled as "Georgia Hensley, et al., v. Computer Sciences Corporation, et al.," bearing case number CV-2005-59-3, and "Alberto Cazares, et al., v. Allstate Insurance Company, et al.," bearing case number CV-2009-72-3 (the "Hensley and Cazares Actions"), which actions concerned Allstate's use of the Colossus software program in adjusting bodily injury claims filed under the uninsured and underinsured motorist coverages of automobile insurance policies. Also included among the materials provided by Allstate and reviewed and considered by the Lead Regulators and the Examiner were certain documents relating to Allstate's engagement of McKinsey & Co. ("McKinsey") in connection with CCPR as well as documents concerning the testing, licensing, implementation, training, use and periodic tuning of the Colossus software program.[9]

The examination took a year and a half, and was incredibly thorough:

C. . . . The exam encompassed the review of over one million (1,000,000) pages of documents, including claims manuals, training materials, complaint data, claims related to market conduct exams, company records and related information in varying formats.
. . .

D. The Lead Regulators and the Examiner met with representatives of Allstate several times throughout the course of the Examination to discuss and have Allstate formally present, explain and review documentation regarding the organization of its claims operations, the development of its claims practices from the mid-1990's to the present, training, performance evaluation and compensation of claims personnel, and the Colossus software program which included demonstrations of the program's use by Allstate. The meetings also included detailed discussions of Allstate's financial performance for the period under review as well as a review of allegations by third parties concerning Allstate's claims and litigation practices.

E. The Lead Regulators and the Examiner met with representatives of CSC which made presentations explaining and demonstrating the development and use of the Colossus software program both at Allstate and at CSC's divisional headquarters in Austin, Texas.

F. The Examiner visited Allstate field offices in four different states, where it conducted interviews of over forty (40) current and former Allstate claims employees, including casualty adjusters and other claims

---

[9] MMCRA, ¶ I.C.

personnel, The Examiner also interviewed others who claimed to have knowledge of Allstate's claims practices.

G. During Phase II of the Examination and at the request of the Lead States, Allstate collected, formatted and provided electronic data and claims information for all bodily injury claims on which the Colossus software program was used for loss years 1995 through mid-2009, and for all bodily injury claims paid and closed in 2008, whether or not the Colossus software program was used. In total, Allstate provided electronic data and claims information for nearly two million (2,000,000) separate bodily injury claims.

H. The Examiner spent over eight thousand five hundred (8,500) hours reviewing and analyzing the materials and claims data provided and conducting the activities described above.[10]

Mr. Romano's testimony is merely a conduit for allegations by Plaintiff that Allstate made offers, or as is the case here, didn't make offers, based on claim software injury values which were intentionally calibrated to recommend artificially low values in violation of Florida insurance statutes – the *precise* issue already decided by the Florida Office of Insurance Regulation, the primary state agency charged with comprehensive regulation of the insurance industry. Under the doctrines of primary jurisdiction, and principles of comity and judicial deference to state agency determinations, this Court should not consider a challenge to a practice expressly permitted and approved by the state regulatory agency, both as a matter of state law in this diversity case,[11] and as matter of federal law.[12]

Finally, Mr. Romano's testimony and "opinions" relate to Allstate's alleged general business practices during Mr. Romano's employment at Allstate (well before the material time frame of this case). However, anything beyond how Allstate acted *within the claim by Plaintiff* is irrelevant in this claim for compensatory damages for bad faith because any such inquiry would necessarily reach into Allstate's general business practices. *See Jablonski v. St. Paul Fire*

---

[10] MMCRA, ¶¶ 1.C though H.
[11] See *Flo-Sun, Inc. v. Kirk*, 783 So.2d 1029 (Fla. 2001)
[12] See *Burford v. Sun Oil Co.*, 319 US 315 (1943).

& *Marine Ins. Co.*, No. 2:07-CV-00386, 2009 WL 2252094 (M.D. Fla. 2009).  In *Jablonski*, a

bad faith case, the Middle District held that in order to recover punitive damages, a general

business practice claim must be plead and proven. *Id.* at *2.  The specific jury instruction was as

follows:

> You may award punitive damages to Plaintiff Edward Jablonski if you find
> that Jablonski has proved by the greater weight of the evidence any one or all
> of his claims against St. Paul, and if you find that Jablonski has proved by
> clear and convincing evidence that:
>
> > 1) the acts giving rise to the violation occurred with such frequency as to
> > indicate a general business practice; and
> >
> > 2) these acts were willful, wanton, and malicious, or in reckless disregard
> > for the rights of the insured.
> > ....
> > In order to make a showing of a "general business practice," Edward
> > Jablonski *must show more than St. Paul's acts within his own claim.*

*Id.* (emphasis in original).   *See also Shannon R. Ginn Constr. Co. v. Reliance Ins. Co.*, 51 F.

Supp. 2d 1347 (S.D. Fla.1999) (requiring evidence outside of the insurance company's behavior

in dealing with the plaintiff's claim in order to prove a general business practice).

The holdings in *Jablonski* and *Shannon* make clear that in order for matters outside of an

insurer's handling of and decision-making processes regarding the particular claim at issue in the

bad faith suit to be relevant, a claim for punitive damages based on general business practices

must be at issue.  There is no other basis under Florida bad faith law that such matters would be

relevant.  No claim for punitive damages has been made by Plaintiff in this case and therefore

Plaintiff cannot use Mr. Romano to testify as to irrelevant alleged general business practices.

## F.  MR. ROMANO'S OPINIONS ARE NOT BASED ON RELIABLE FOUNDATIONS.

Mr. Romano's opinions cannot be the product of reliable principles when his opinions

and testimony are based upon what Allstate did during the time he was employed with them with

respect to the re-tuning of the Colossus system.  This is a very thin slice of one aspect of claim handling, as Colossus itself is one of several tools used to determine the value of a claim.  Mr. Romano's opinions and testimony do not constitute opinions regarding the industry standards of claim handling in Florida and the extent to which Allstate acted consistently with those standards.  He also did not rely on any statutes, law or case law, and did not identify any specific law or regulations when asked the basis for his opinions – only that they were based upon his experience while employed at Allstate from 1999 to 2009 and general claims experience across the country from 20 years ago when he worked as an adjuster or adjuster supervisor, with limited experience in the state of Florida.  Additionally, a number of his claims in his Report are based entirely on inadmissible hearsay.[13]  Mr. Romano's "experience" is wholly insufficient to form a reliable foundation.  *See, e.g. Goodbys Creek, LLC v. Arch Ins. Co.*, 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *2 (M.D. Fla. 2009)(excluding opinions of an alleged "bad faith" expert pursuant to *Daubert*, where the witness "merely assert[ed] his 'opinions will be based on documents provided, as well as [his] 38 years' experience' ....")

Further, Mr. Romano does not (and cannot) assert that his experience he utilized in rendering his opinions constitutes the same information relied upon by experts in the field. Additionally, he has not cited any instances of peer review, publications, or common methods utilized by others in the industry relating to his methodology for a determination of good faith claim practices pursuant Florida law.  Mr. Romano's opinions are neither "objective nor independent" as required under the relevant analysis. Mr. Romano's testimony amounts to nothing more than his "subjective belief or unsupported speculation" expressly addressed by *Daubert*.  Opinion testimony that amounts to nothing more than rank speculation or a witness's

---

[13] For example, in his Report, he states, "I have knowledge, from my time working at Allstate ***and from discussions I had with Allstate Claim Senior Manager William Vanderborg*** that Allstate initially tuned Colossus down by 2O% to achieve the desired savings." (emphasis added).

subjective belief is inadmissible. *See Daubert, 509 U.S. at 590* (*"*Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation;") *Rogers v. Ford Motor Co.,* 952 F. Supp. 606, 615 (N.D. Ind. 1997) ("the district court's foremost objective must be to rule out subjective belief or unsupported speculation"). In sum, other than purely personal opinions, Mr. Romano's opinions are of no value and invade the province of the jury.

A further indication that Mr. Romano's opinions are not based on a reliable foundation is that the opinions are based on an inaccurate concept of the obligations an insurer owes its insured party in Florida. In other words, Mr. Romano's opinions regarding Allstate's good faith duties cannot be said to be reliable when they are contradicted by the evidence in this case as well as Florida law governing good faith insurance practices.

First, Mr. Romano inaccurately portrays Allstate's policies and procedures governing how Allstate adjusters evaluate claims. He claims that Allstate puts "data input restrictions and requirements" on adjusters using Colossus such as

- Require adjusters with no formal medical education or credentials to second guess medical professionals by altering significant details of medical reports and selecting injury codes that yield lower recommended settlement values.
- Encourage adjusters to select final prognosis codes that lower the recommended settlement values.
- Prohibit adjusters from entering information about the likelihood of future medical visits and permanent impairment ratings, which reduces settlement values.
- Require adjusters to run medical bills through a medical re-pricing software program, such as Mitchell DecisionPoint, and then enter the reduced bill amounts into colossus.
- Encourage adjusters to determine that claimants are comparatively negligent, and are thus responsible for paying part of the cost of their treatment.

As an initial matter, Mr. Romano testified that these "bullet points" are based on his recollection of his individual experience and training at Allstate. (Romano Deposition, p. 38, lines 5-11). However, Mr. Romano is listed as an expert witness, not a fact witness – his

testimony regarding his particular experiences and memories at Allstate are not proper subjects for his testimony as an "expert" under Federal Rules of Evidence Rule 702, even if his individual experiences were relevant (which they are not).

These claims by Mr. Romano are completely unsubstantiated. No Allstate adjuster deposed in this case has testified to being directed to do any of the above. Allstate's governing claims handling manual and policy and procedure materials produced by Allstate, provides no support for Mr. Romano's allegations. Contrary to Mr. Romano's "opinions," Allstate adjusters are explicitly instructed to ***not be limited by Colossus*** and to conduct a "thorough review of all relevant factors of damage investigation" as follows:

- Investigation guidelines provide a template of necessary steps based on specifics of the claim. The guidelines determine whether an investigation step is required, recommended, optional or not required. (May be modified by local management.)
- Additional factors unique to a specific claim may support adjustment of the evaluation.
- Any unique facts of the claim should be considered and documented.

(*Allstate's CCPR Training Manuals*,[14] produced in this case on September 23, 2015 in response to Plaintiff's First Request for Production, p. 26-27)

Mr. Romano's entire opinion of Allstate's claim handling centers on Colossus' determination of the value of the claim being the end-all-be-all of the adjuster's claim evaluation. The evidence in this case clearly demonstrates that Colossus is but one tool of several and one step of many in the adjuster's evaluation of claim, so conclusions based entirely thereon cannot reliably provide the foundation for conclusions on claim handling which are required to be based on a totality of the circumstances. Mr. Romano's qualms with Colossus' value determination

---

[14] These materials produced as part of discovery in this case are protected pursuant to a Confidentiality Agreement executed by counsel for the parties in this case. In the event the Court believes the documents themselves will assist the Court in its determination of the issues herein, Allstate will promptly file same with the Court (under seal, as appropriate).

provide any even less reliable foundation for his conclusions on Allstate's claim handling given that, as explained above, the Colossus' value determination was not even used to determine the settlement amount offered in this case.

As to Mr. Romano's "expertise" regarding the tuning of the Colossus program, sufficient foundation for a very precise opinion as to an output for a detailed, complex program, given numerous specific inputs and the parameters unique for location and time, *cannot be based only on a generalized assertion of prior experience* using the program, especially where that experience is dated by more than five years, was in an entirely different geographic region, and with a different version of the program. Expert opinions that are based on such generalized assertions of experience, in different circumstances, are not reliable and should be excluded. The Rules do not permit an expert to testify based on his own made-up "facts" or theories that are not supported by actual evidence.

Finally, Mr. Romano's conclusions as to how Allstate failed to meet its duty of good faith to its insureds are premised on duties Mr. Romano seeks to impose on Allstate that are not supported (and in some instances are plainly contradicted) by Florida law. For example, in his report, Mr. Romano suggests that "[i]lf Allstate had any concerns or questions regarding Mr. Wojciechowski's injuries or treatment, they could have utilized a peer review of the medical records, requested that he submit for a CME (Compulsory Medical Examination), taken an EUO (Examination Under Oath), or used the authorizations provided to obtain additional information. Allstate chose to do none of the above." However, governing case law specifically states that the information provided to an insurance carrier by counsel for the claimant, including the staff, is reliable information and it is reasonable for the insurance carrier to rely on that information without need to independently confirm or deny the truth of the information provided by the claimant or his attorney.[15]

---

[15] *See generally Aboy v. State Farm Mut. Auto. Ins. Co.,* 394 Fed. Appx. 65 (11th Cir. 2010).

Along the same lines, Mr. Romano opines that Allstate did not meet its duty of good faith because, "No Allstate employee ever asked for an opportunity to meet with their policyholder and his attorney to discuss his injury, hear how it impacted his life and offer to assist with his claim." Mr. Romano cites no Florida statute, Adjuster Code of Ethics provision, or case law that would support such a duty on Allstate to do so. Further, this opinion ignores the evidence in this case, where Mr. Castagliola made it clear that he would provide the information about his client's claim when he was ready to do so. (*See* Dkt. 41, Deposition of Paul Castagliola, taken December 3, 2015, at page 22, lines 3-13; page 36, lines 2-24). There is absolutely no obligation of the insurer to force a claimant or his attorney to be forthcoming with information the claimant/attorney does not want to provide. Further, Allstate did in effect reach out to Mr. Wojciechowski in its attempt to settle his claim. On at least 2 occasions, once by Ms. Desenti and once by Mr. Prevot, Allstate outlined some of the reasons why Allstate had evaluated the claim the way Allstate had evaluated it, and further stated that Allstate remained willing to review any additional information that Mr. Castagliola wanted to submit on behalf of his client and re-evaluate based on same. (*See* Dkt. 38-15; Dkt. 42, Deposition of Steve Prevot, taken January 14, 2016, at p. 153, lines 8-17). At no time did Allstate deny Mr. Wojciechowski's claim. *See e.g.* Dkt. 39, Deposition of Carolyn Mitchell, taken January 28, 2016, at page 50, lines 6 – page 51, line 16.

### G. CONCLUSION

Mr. Romano should be prohibited from testifying as an expert in this matter because he is not qualified to provide an expert opinion on Florida insurance claim handling; his opinions regarding Colossus are not relevant to any issues of fact in this matter; his opinions are not based on a reliable foundation; and any potential relevance of Mr. Romano's opinion are substantially outweighed by the unfair prejudice of Mr. Romano's speculative opinions as to Allstate's motivations.

## H.  RULE 3.01 CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for Allstate has conferred with opposing counsel, but the parties were unable to resolve the issues raised herein.


Respectfully submitted on March 18, 2016.


/s/   Jennifer C. Worden   _____
Jennifer C. Worden, Esq.
Florida Bar ID No: 0498191
Email: jworden@civillit.com
Daniel A. Martinez, Esq.
Florida Bar ID No: 0009016
E-mail: dmartinez@civillit.com
Weslee L. Ferron, Esq.
Florida Bar ID No: 0548537
Email: wferron@civillit.com
Martinez Denbo, LLC
2935 First Avenue North, Second Floor
St. Petersburg, Florida 33713
(727) 894-3535, Telephone Number
(727) 502-9621, Facsimile Number
Service address: servicestp@civillit.com


## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to **Stephanie Miles, Esquire** at team3eservice@swopelaw.com, eservice@swopelaw.com, and StephanieM@swopelaw.com; **Paul Castagliola, Esquire** at PCastagliola@CastagliolaLaw.com and alewis@Castagliolalaw.com; and **Elizabeth C. Munro, Esquire** at elizabethm@vanguardattorneys.com and courtdocuments@vanguardattorneys.com, attorneys for Plaintiffs.

/s/ Jennifer C. Worden
Jennifer C. Worden, Esq.
Florida Bar ID No: 0498191
Email: jworden@civillit.com
Service address: servicestp@civillit.com