## MULTI-STATE MARKET CONDUCT REGULATORY AGREEMENT

This Multi-State Market Conduct Regulatory Agreement (the "Agreement") is entered into between and among Allstate Insurance Company and the affiliates of Allstate listed on **Exhibit A** attached hereto and incorporated by reference (collectively, "Allstate"), the Commissioner of the Florida Office of Insurance Regulation, the Director of the Illinois Department of Insurance, the Commissioner of the Iowa Insurance Division, and the Superintendent of the New York State Insurance Department (collectively the "Lead Regulators"), and the insurance regulators of each of the remaining jurisdictions and the District of Columbia listed on **Exhibit B** attached hereto and incorporated by reference that agree to approve this Agreement (the "Participating Regulators") (the Lead Regulators and Participating Regulators are collectively referred to herein as "Signatory Regulators") (Allstate and the Signatory Regulators are collectively referred to herein as the "Parties").

### I. RECITALS

**A.**     On March 30, 2009, the Illinois Department of Insurance issued examination warrants on behalf of the Lead Regulators initiating a targeted multi-state market conduct examination of Allstate's claims handling practices (the "Examination"). The Examination was governed by the laws of the State of Illinois, and was conducted in accordance with the National Association of Insurance Commissioners' Market Regulation Handbook. As directed by the Lead Regulators, the Examination focused primarily on Allstate's handling of bodily injury claims from the mid-1990's to the present, including its use of computer systems to settle such claims. The Examination included a review of Allstate's use of claims handling software, particularly the Colossus software program licensed by Allstate from Computer Sciences Corporation ("CSC"), as a tool in determining payment amounts for claims, Allstate's training, performance evaluation and compensation of claims personnel, and Allstate's handling of bodily injury claims where the claimant was represented by an attorney ("attorney represented claims").

**B.**     The Lead Regulators designated INS Regulatory Insurance Services, Inc. (the "Examiner") to assist in performing the Examination. The Examination was to include three phases:

**1.**     Phase I was designed to comprehensively review Allstate's bodily injury claims practices from the mid-1990's to the present, including a project undertaken by Allstate in 1993 and 1994, and implemented in 1995 and 1996, known as Claims Core Process Redesign ("CCPR") and the adoption and use of the Colossus software program;

**2.**     Phase II was designed to analyze Allstate bodily injury claims data for the period under review; and,

**3.**     Phase III was designed to review Allstate bodily injury claims files if the Lead Regulators determined such a review was necessary.

**C.**     The Examiner began its on-site work on April 21, 2009. The exam encompassed the review of over one million (1,000,000) pages of documents, including claims manuals, training materials, complaint data, claims related to market conduct exams, company records and related

information in varying formats. Included among the documents provided to and considered by the Examiner and the Lead Regulators were pleadings and documents in the actions in the District Court for Miller County, Arkansas, styled as "Georgia Hensley, et al., v. Computer Sciences Corporation, et al.," bearing case number CV-2005-59-3, and "Alberto Cazares, et al., v. Allstate Insurance Company, et al.," bearing case number CV-2009-72-3 (the "Hensley and Cazares Actions"), which actions concerned Allstate's use of the Colossus software program in adjusting bodily injury claims filed under the uninsured and underinsured motorist coverages of automobile insurance policies. Also included among the materials provided by Allstate and reviewed and considered by the Lead Regulators and the Examiner were certain documents relating to Allstate's engagement of McKinsey & Co. ("McKinsey") in connection with CCPR as well as documents concerning the testing, licensing, implementation, training, use and periodic tuning of the Colossus software program.

D.      The Lead Regulators and the Examiner met with representatives of Allstate several times throughout the course of the Examination to discuss and have Allstate formally present, explain and review documentation regarding the organization of its claims operations, the development of its claims practices from the mid-1990's to the present, training, performance evaluation and compensation of claims personnel, and the Colossus software program which included demonstrations of the program's use by Allstate. The meetings also included detailed discussions of Allstate's financial performance for the period under review as well as a review of allegations by third parties concerning Allstate's claims and litigation practices.

E.      The Lead Regulators and the Examiner met with representatives of CSC which made presentations explaining and demonstrating the development and use of the Colossus software program both at Allstate and at CSC's divisional headquarters in Austin, Texas.

F.      The Examiner visited Allstate field offices in four different states, where it conducted interviews of over forty (40) current and former Allstate claims employees, including casualty adjusters and other claims personnel. The Examiner also interviewed others who claimed to have knowledge of Allstate's claims practices.

G.      During Phase II of the Examination and at the request of the Lead States, Allstate collected, formatted and provided electronic data and claims information for all bodily injury claims on which the Colossus software program was used for loss years 1995 through mid-2009, and for all bodily injury claims paid and closed in 2008, whether or not the Colossus software program was used. In total, Allstate provided electronic data and claims information for nearly two million (2,000,000) separate bodily injury claims.

H.      The Examiner spent over eight thousand five hundred (8,500) hours reviewing and analyzing the materials and claims data provided and conducting the activities described above. After the completion of Phase II of the Examination, the Lead Regulators determined that a review of individual claims files was not necessary. Accordingly, proposed Phase III of the Examination was not conducted.

I.      This Agreement, among other things, requires changes to certain business practices that Allstate agrees to undertake with respect to its use of the Colossus software program in the

adjustment of bodily injury claims, as well as a process for measuring compliance with this Agreement.

J.      The Examination was the first multi-state examination of a national personal lines carrier targeted toward the use of software technology tools in the claims handling process. The Lead Regulators concluded that while the insurance industry's use of software technology tools in the claims handling process can provide significant benefits to the public in increased objectivity and efficiency, such use also can present special regulatory monitoring issues, and that regulatory authorities need to develop processes to properly monitor their use. As a result of the Examination, Allstate has agreed to provide Ten Million Dollars ($10,000,000) to a fund (the "Regulatory Fund") for use by Signatory Regulators, to the extent consistent with applicable state law, in developing and training examination personnel in processes designed to review and monitor the insurance industry's use of software technology tools in the claims handling process. This Agreement also sets forth the agreement among the Parties with regards to the Regulatory Fund.

## II. FINDINGS

A.      **Claims Core Process Redesign (CCPR).** Based on the information and documents provided in the course of the Examination, the Lead Regulators make the following findings concerning the CCPR project undertaken by Allstate in the 1990's.

1.      In 1993 and 1994, Allstate undertook a project to review and redesign its claims processes in response to data indicating that its casualty claims payments were increasing faster than inflation, medical CPI and the industry as a whole. Allstate engaged McKinsey to assist with the project.

2.      The policies and practices implemented by Allstate as a result of CCPR are reflected in Allstate's 1995 CCPR Implementation Training Manual.

3.      The new casualty claims evaluation process included, among other things, the creation of a new position called the Evaluation Consultant or "EC." Allstate's Evaluation Consultants are experienced claims personnel whose role is to review the information in a bodily injury claim file after the claims adjuster completes the investigation and evaluation. Then, in consultation with the adjuster, the Evaluation Consultant places a value on the claim, expressed as a range (the "Evaluation Range"). Allstate's adjusters negotiate claims settlements within the Evaluation Range unless new information or other circumstances indicate a different value.

B.      **The Colossus Software Program as Used by Allstate.** Based on the information and documents provided in the course of the Examination, the Lead Regulators make the following findings concerning the Colossus software program and the way it is used by Allstate.

1.      At the time the CCPR project began, Allstate separately began evaluating the Colossus software program for possible use in its casualty claims handling processes.

2.      The Colossus software program is a rule based program with approximately six hundred (600) injury profiles and is a tool Allstate adjusters use in evaluating general damages for certain bodily injury claims.

3.      The Colossus software program is a systematic approach to investigating and evaluating injury claims that requires the adjuster to assemble and input detailed medical information into the software program. Through a series of menus and prompts, the Colossus software program solicits information and identifies inconsistencies for the adjuster to consider concerning the injury, its treatment, results and prognosis and provides an extensive medical reference system.

4.      Based on the information entered, the Colossus software program assigns trauma severity points to the injury. Determination of the relative severity of an injury is based on a set of approximately ten thousand (10,000) rules.

5.      Trauma severity points range from zero to hundreds of thousands for the gravest of injuries. Once the Colossus software program assigns trauma severity points to an injury, the program generates a value, expressed as a range for general damages associated with that trauma severity, using a mathematical function or curve which maps trauma severity points to dollar amounts for general damages.

6.      The Colossus software program is periodically modified or "tuned." Tuning is the process whereby recent settlement data is mapped onto trauma severity points, which updates the tuning curve described above. Therefore, the monetary value associated with trauma severity points is updated to reflect recent settlement data.

7.      Allstate has conducted a nationwide tuning analysis of the Colossus software program approximately every twelve (12) to eighteen (18) months, and has completed this process in all tuning regions at least ten (10) times since initial implementation in 1995 and 1996. Allstate currently has one hundred nineteen (119) tuning regions, including at least one region for each state. Generally, where settlement values of similar claims vary by more than ten percent (10%), separate tuning regions within a state are created.

8.      The Colossus software program does not assess or revise special damages, such as past or future medical bills, lost wages, or other out-of-pocket expenses. These items are manually entered by the adjuster. The program then adds these amounts to its recommendation for general damages.

9.      The Colossus software program does not assess or revise liability issues, such as comparative negligence. Any percentage of comparative negligence is entered manually by the adjuster. The program then reduces its recommendation by that manually entered percentage.

10.     The Colossus software program does not assess or revise offsets. Offsets are manually entered by the adjuster, and the program subtracts the manually entered offsets from its recommendation.

11.     Allstate adjusters consider many factors that may affect the value of a claim such as aggravated liability issues, credibility of witnesses and questions relating to causation of a claimed injury.

12.     The Examination determined that there should be enhanced management oversight to ensure adherence to established criteria for selection of claims to use in the tuning

process and a uniform methodology for determining the number of claims to be used in each tuning region. However, the Examination found no evidence of improprieties with respect to any particular claim selection or tuning.

**C.**     **Claim Data.**  Based on analysis of data collected, formatted and provided by Allstate for all bodily injury claims on which the Colossus software program was used for loss years 1995 through mid-2009, and for all bodily injury claims paid and closed in 2008, whether or not the Colossus software program was used, the Lead Regulators make the following findings.

**1.**     Allstate uses the Colossus software program on approximately fifty percent (50%) of all automobile bodily injury claims.

**2.**     Allstate resolves over ninety percent (90%) of the claims on which the Colossus software program is used within the Evaluation Range.  There is no evidence that Allstate established a policy or rule requiring its claims adjusters and/or Evaluation Consultants to settle claims within a range of the value recommended by the Colossus software program.

**3.**     Individual claims files were not reviewed.  Consequently, there is no finding regarding the payment of any particular bodily injury claim.

### III. CONCLUSIONS

**A.**     Based on review of the materials, information and documents produced in the course of the Examination, the Lead Regulators did not identify institutional issues involving underpayment of claims.   The Examination, however, determined the need for enhanced management oversight of Allstate's use of the Colossus software program.

**B.**     The Lead Regulators recommend, and Allstate has agreed to undertake and adopt, certain claims practices and procedures as set forth herein.  The prospective processes outlined in this Agreement constitute proper and appropriate practices for use of software programs such as the Colossus software program in the adjustment of claims.

### IV. AGREEMENTS

**A.**     **Agreements by Allstate.**

**1.**     **Casualty Claims Practices.**  Allstate agrees that it will implement the casualty claims practices described in this Agreement within one hundred eighty (180) days of the Effective Date of this Agreement, unless otherwise specified, and conduct any necessary retraining of affected claims personnel.

a. **Disclosure.** Allstate will provide notice to claimants that the Colossus software program may be used in the adjustment of their bodily injury claims in substantially the form set forth in **Exhibit C** to this Agreement.

b. **Tuning Analysis of the Colossus Software Program.** Allstate will adopt the sampling and management oversight practices set forth in **Exhibit D** to this Agreement.

c. **Internal Audit.** Allstate will adopt the audit and reporting requirements set forth in **Exhibit E** to this Agreement.

d. **Claims Manuals.** Allstate will consolidate the primary functions of its casualty claims practices in a single Casualty Claims Practice Manual within twelve (12) months of the Effective Date of this Agreement. Allstate agrees that it will maintain its Casualty Claims Practice Manual in an electronic format and that it will be readily available to all casualty claims adjusting personnel.

e. **Adjuster Evaluation and Compensation.** Allstate will not establish a policy or rule requiring its adjusters and/or Evaluation Consultants to settle claims based solely on the value recommended by the Colossus software program. Allstate also will not provide incentives to adjusters and/or Evaluation Consultants for settling claims above or below the value recommended by the Colossus software program.

f. **Colossus Software Program Updates.** Allstate will document the reasons should it elect not to adopt a particular update or version of the Colossus software program issued by CSC.

g. **The Evaluation Range.** The Colossus software program will generate a specific value for general damages which both the adjuster and Evaluation Consultant will consider during the evaluation of a claim. Allstate adjusters will rely on the Evaluation Range established by the Evaluation Consultant for negotiating bodily injury claims when the Colossus software program is used.

2. **Regulatory Fund.** Within thirty (30) calendar days of the Effective Date of this Agreement, Allstate will establish on its books a notional account entitled "Regulatory Fund" in the amount of Ten Million Dollars ($10,000,000) intended for use by Signatory Regulators, to the extent consistent with applicable state law, in developing and training examination personnel in processes designed to review and monitor the insurance industry's use of software technology in adjusting claims. After the payments to the Lead Regulators, as set forth in Section IV.A.3. below, the Nine Million Eight Hundred Thousand Dollars ($9,800,000) remaining in the Regulatory Fund shall be allocated and paid to the Signatory Regulators, including the Lead Regulators, pursuant to the formula set forth in **Exhibit F** to this Agreement.

3. **Payment to Lead Regulators.** Within thirty (30) calendar days of the establishment by Allstate of the Regulatory Fund, a payment of Fifty Thousand Dollars

($50,000) will be made from the Regulatory Fund to each of the Lead Regulators to offset examination expenses incurred by the Lead Regulators.

**B.**   **Agreements by Signatory Regulators.**

**1.**   **Resolution of All Issues.** This Agreement herewith resolves, as between Allstate and the Signatory Regulators, all matters set forth in Sections II. and III. of this Agreement. This Agreement shall be in lieu of any disciplinary, legal, regulatory or enforcement action(s) that could have been taken by any Signatory Regulator relating to matters set forth in Sections II. and III. of this Agreement.

**2.**   **No Other Limitation.** Nothing in Section IV.B.1. of this Agreement shall in any way limit any Signatory Regulator from investigating specific instances of individual consumer complaints and imposing any individual requirements or sanctions which arise from such individual consumer complaints. Nothing in this Section IV.B.2. shall in any way limit any Signatory Regulator from performing other regulatory functions, or any action whatsoever, regarding any subject other than the stated subjects of Phase I and II of this Examination.

**3.**   **Confidentiality and Notice.** The Signatory Regulators expressly recognize Illinois as the producing state of information or material received regarding the Examination and agree that any and all working papers, information, documents, communications, data and material produced by, or in the possession of the Signatory Regulators, the Examiner or Allstate related to, in connection with or as a result of the Examination (the "Examination Materials") is confidential and shall be afforded confidential treatment to the fullest extent provided by Illinois state law. The Signatory Regulators shall cause the Examiner to provide all Examination Materials in their possession to the Illinois Department of Insurance for retention or other appropriate disposition. The Signatory Regulators further agree, and shall cause the Examiner to agree, to provide Allstate and the Lead Regulators timely notice of any request by a third party for copies of, or access to, the Examination Materials in their possession. For purposes of this Section IV.B.3., timely notice shall mean notice that provides Allstate a meaningful opportunity to evaluate and defend any production of or request for access to the Examination Materials.

**C.**   **Compliance.**

**1.**   **Compliance Review.** The Lead Regulators, on behalf of the Signatory Regulators, shall conduct a compliance review at the earliest practicable time at least one year from the Effective Date of this Agreement and annual reviews thereafter for a period of four (4) years, the last occurring on or before December 31, 2015. The limited purpose of the compliance review shall be to determine Allstate's compliance with Section IV.A.1. of this Agreement. Allstate and the Lead Regulators agree to meet in advance of each compliance review and work in good faith to develop the protocols and procedures for its conduct. The compliance reviews may be conducted by a third party designated by the Lead Regulators. Allstate shall pay the reasonable fees and expenses incurred for each such compliance review.

**2.**   **Consequences of Failure to Comply.** In the event that a compliance review discloses that Allstate has materially failed to comply with Section IV.A.1., the Lead Regulators

shall provide Allstate with a written Notice of Failure to Comply, specifying the particular material failures found in the compliance review. Allstate shall have thirty (30) days within which to cure such material failure to comply. Whether Allstate is able to materially comply within the thirty (30) day cure period shall not limit any Signatory Regulator from taking any enforcement action related to Allstate's violation of Section IV.A.1. of this Agreement. Allstate shall retain all its legal rights to challenge any finding or regulatory action taken pursuant to the provisions of this paragraph.

**D.**   **Miscellaneous Provisions.**

   **1.**   **Successors and Assigns.** This Agreement shall be binding on and inure to the benefit of Allstate and the Signatory Regulators, and their respective legal representatives, successors and assigns.

   **2.**   **Authority.** Each of the Signatory Regulators has full and unqualified legal authority to enter into this Agreement and, where such signatory is signing on behalf of a party, to bind that party now and in the future. Each person executing this Agreement on behalf of Allstate Insurance Company or any of the affiliates of Allstate listed on Exhibit A has full and unqualified legal authority to enter into this Agreement on behalf of Allstate Insurance Company or such affiliate.

   **3.**   **Choice of Law.** The Signatory Regulators and Allstate agree that Illinois law shall apply to this Agreement and any issue regarding the conduct of the Examination or confidentiality of the Examination Materials.

   **4.**   **No Third Party Beneficiaries.** Nothing herein shall confer any rights upon any persons or entities other than the Signatory Regulators and Allstate.

   **5.**   **No Indemnification.** Allstate shall not seek or accept, directly or indirectly, indemnification pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to Section IV.A.2. of this Agreement.

   **6.**   **Effective Date.** The effectiveness of this Agreement is conditioned upon the following:

      a.   approval and execution of this Agreement by Allstate and each of the Lead Regulators, and

      b.   approval and execution of this Agreement by the appropriate regulatory official, including the Lead Regulators, on behalf of either:

         (i)   at least thirty-eight (38) states or jurisdictions of the United States irrespective of Allstate's direct written premium in those states (the "state threshold"), or

        (ii)   states or jurisdictions, which may be less than thirty-eight (38), representing at least seventy percent (70%) of Allstate's private passenger automobile

liability direct written premium as reflected in Allstate's 2009 Annual Statements (the "premium threshold"). A state by state listing of Allstate's private passenger automobile liability direct written premium as reflected in Allstate's 2009 Annual Statements is contained in **Exhibit G**.

Subject to Section IV.D.8., the earlier date on which either the state threshold or the premium threshold is satisfied shall be the "Effective Date" of this Agreement. The Director of Insurance of Illinois will maintain the original signatures to this Agreement and will advise the other Parties when either threshold has been satisfied.

**7.** **Term.** This Agreement shall commence on the Effective Date and remain in effect until December 31, 2015, unless otherwise amended in accordance with Section IV.D.12.

**8.** **Execution.** To become a party to this Agreement, an Insurance Director, Commissioner, Superintendent or their designee shall execute a signature page in the form attached as **Exhibit H** within thirty (30) days from the latest date on which one of the Lead Regulators executes this Agreement (the "Execution Date"). If a Signatory Regulator finds that, under applicable state law, regulation or procedure, the preparation and execution of a consent order is necessary to carry out the terms of this Agreement, such a consent order (the "Applicable Consent Order") shall be prepared by such Signatory Regulator within thirty (30) days following the Execution Date. The Lead Regulators and Allstate may waive the thirty (30) day period for Signatory Regulators to execute this Agreement. For purposes of this Agreement, an "Applicable Consent Order" shall be satisfactory to Allstate if it: (a) incorporates by reference and attaches via exhibit a copy of this Agreement, (b) expressly adopts and agrees to the provisions of this Agreement, and (c) includes only those other terms that may be legally required in the jurisdiction of the applicable Signatory Regulator. However, nothing in this Agreement shall be construed to require any jurisdiction to execute and deliver an Applicable Consent Order if such jurisdiction elects instead to sign this Agreement.

**9.** **Enforceability.** Each Signatory Regulator hereby gives express assurance that this Agreement is enforceable by its terms under the applicable laws, regulations and judicial rulings in its respective jurisdiction, and, that the Signatory Regulator, on behalf of his/her respective jurisdiction, has the authority to enter into this Agreement and bind that party now and in the future. By execution of this Agreement with Allstate, each Signatory Regulator acknowledges that he/she has reviewed and agrees with the terms and conditions as set forth herein. Allstate Insurance Company and each of the affiliates of Allstate listed on Exhibit A ("each Allstate entity") hereby gives express assurance that this Agreement is enforceable by its terms under the applicable laws, regulations and judicial rulings applicable to each Allstate entity, that each Allstate entity entering into this Agreement is authorized to do so and that the person executing this Agreement on behalf of each Allstate entity has the authority to enter into this Agreement and bind such Allstate entity now and in the future. By execution of this Agreement with each Signatory Regulator, each Allstate entity acknowledges that it has reviewed and agrees with the terms and conditions as set forth herein.

10. **Extensions.** The Lead Regulators and Allstate may mutually agree, in writing, to any reasonable extensions of time that might become necessary to carry out the provisions of this Agreement.

11. **Entire Agreement.** This Agreement and/or any Applicable Consent Order or any other order issued by a Signatory Regulator pursuant hereto set forth the entire agreement among the parties with respect to its subject matter and supersedes all prior agreements, arrangements or understandings, whether in written or oral form, between Allstate and the Signatory Regulators.

12. **Amendments.** This Agreement (or its Exhibits and their Attachments) may be amended by the Lead Regulators and Allstate, provided that such amendment does not materially alter this Agreement. Any material amendment to the terms of this Agreement (or its Exhibits and their Attachments), which would affect the authority of any Signatory Regulator(s), shall not become effective without the written consent of such Signatory Regulator(s). All such amendments to this Agreement shall be in writing.

13. **No Alteration of Contractual Obligations.** Nothing in this Agreement or any of its terms and conditions shall be interpreted to alter in any way the contractual terms of any insurance policy issued or acquired by Allstate other than as required by Section IV.A.

14. **Admissibility.** Allstate does not admit, deny or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it, but considers it desirable for this matter to be resolved. Except in a proceeding to enforce the terms hereof, neither this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Signatory Regulators, or others, as evidence of or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to Allstate or any affiliates thereof, or as a waiver by Allstate or any affiliates thereof of any applicable defense, including without limitation any applicable statute of limitations or statue of frauds.

15. **Expenses.** In addition to payments required hereunder, Allstate agrees to pay the reasonable expenses incurred by the Lead Regulators for their travel and incidental expenses associated with the negotiation and implementation of the provisions of this Agreement. Such expenses shall be payable to the Lead Regulators within thirty (30) days of the presentation of valid receipts. Moreover, reasonable expenses of the Lead Regulators incurred in monitoring Allstate's compliance with this Agreement, including the expenses of conducting or attending any meetings, presentations, or discussions with Allstate or other Signatory Regulators, shall be the responsibility of Allstate.

16. **Notice.** All notices permitted or required to be delivered under this Agreement shall be in writing and shall be deemed so delivered by hand, one (1) business day after transmission by facsimile or other electronic system, evidenced by machine generated receipt, five (5) business days after being placed in the hands of a commercial courier service for express delivery, or ten (10) business days after placement in the mail by registered or certified mail, return receipt requested, postage prepaid and addressed to the following addresses or a party's most current principal address of which the party sending the notice has been notified:

- 10 -

| If to Allstate: | David Nadig, Esq.<br>Allstate Insurance Company<br>2775 Sanders Road, Suite A4<br>Northbrook, IL  60062 |
| --- | --- |
| Copy to: | Jeffrey Thomas, Esq.<br>Mitchell Williams Selig Gates & Woodyard, PLLC<br>425 West Capitol Avenue, Suite 1800<br>Little Rock, AR  72201 |
| If to the Lead Regulators: | Illinois Department of Insurance<br>Attn: General Counsel<br>State of Illinois<br>320 W. Washington St., 4th Floor<br>Springfield, IL  62767-0001 |

**17.** **Severability.** In the event that any portion of this Agreement is held invalid under any particular jurisdiction's law as it is relevant to a Signatory Regulator, such invalid portion shall be deemed to be severed only in that jurisdiction and all remaining provisions of this Agreement shall be given full force and effect and shall not in any way be affected thereby.

**18.** **Counterparts.** This Agreement may be signed in multiple, counterparts, each of which shall constitute a duplicate original, but which taken together shall constitute but one and the same instrument.

**EXECUTED BY:**

**Allstate Insurance Company and its Affiliates**

David G. Nadig
Vice President and Deputy General Counsel

Date  08 / 27 / 2016

I, David G. Nadig, hereby affirm that I am the Vice President and Deputy General Counsel of Allstate Insurance Company and have the authority to execute this Agreement on the behalf of Allstate Insurance Company and its affiliates listed in Exhibit A.

- 11 -

**Illinois Department of Insurance**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**Florida Office of Insurance Regulation**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**New York State Insurance Department**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**Iowa Insurance Division**

Signature_____

      Printed Name_____

      Title_____

      Date_____

# EXHIBIT A

## Allstate Insurance Company and its Affiliates

| Company Name | NAIC Co. Code |
|---|---|
| Allstate Indemnity Company | 19240 |
| Allstate Insurance Company | 19232 |
| Allstate County Mutual Insurance Company | 29335 |
| Allstate Fire and Casualty Insurance Company | 29688 |
| Allstate New Jersey Insurance Company | 10852 |
| Allstate New Jersey Property and Casualty Ins. Co. | 12344 |
| Allstate Property and Casualty Insurance Company | 17230 |
| Deerbrook Insurance Company | 37907 |
| Encompass Indemnity Company | 15130 |
| Encompass Insurance Company | 10358 |
| Encompass Insurance Company of New Jersey | 11599 |
| Encompass Property and Casualty Insurance Company of New Jersey | 12496 |
| Encompass Floridian Insurance Company | 11993 |
| Encompass Floridian Indemnity Company | 11996 |
| Encompass Insurance Company of Massachusetts | 12154 |
| Encompass Insurance Company of America | 10071 |
| Encompass Property and Casualty Insurance Company | 10072 |
| Encompass Independent Insurance Company | 11251 |
| Encompass Home and Auto Insurance Company | 11252 |
| Northbrook Indemnity Company | 36455 |

# EXHIBIT B

**Participating Regulators**
*(Illinois to provide after the Effective Date)*

# EXHIBIT C

## FORM OF NOTICE

**EXHIBIT C – Attachment 1**
**Notice to Repped UM/UIM Claimant**

MCO Name
MCO Address
City, State, Zip



[RECIPIENT FNAME] [RECIPIENT LNAME]
[RECIPIENT ADDRESS]
CITY STATE ZIP

Current Date

INSURED:  [INSD FN INSD LN]          PHONE NUMBER:  [Office 1-800]
DATE OF LOSS:  [S-DOL]                FAX NUMBER:
CLAIM NUMBER:  [S-Claim # & Desk Loc]  OFFICE HOURS:
YOUR CLIENT:  [S-InvdID FN & LN] Allow up to 4

## Re:  Important Information Regarding Your Client's Claim

Dear [Recipient FN & LN]:

Thank you for notifying us that you will represent [S-InvdID injured person] in this loss listed above. Please know that we have assigned [S-Representative Name] to handle your client's claim.

I will assist [S-Representative Name] with the claim processing, so please be sure to send all claim correspondence to the address listed above and direct it to the attention of [M-FF Text].

Since your client is presenting an Uninsured/Underinsured Motorist claim, your client will need to establish some basic facts.

First, your client must demonstrate that he or she is legally entitled to recover damages from the owner or operator of an uninsured auto, as defined in the insurance contract. Then, your client must also prove that the damages are recoverable. You can refer to your client's policy for more details about how you can meet these conditions.

We have enclosed a Notice of Claim form and a [S-Based on Form Selected] for your client to complete, sign and return to us. The first form will provide us with some basic facts about your client's claim. The second form authorizes us to obtain all necessary medical and/or lost income records to further our investigation.

Once we receive all the information we need to complete our investigation and evaluate your client's claim, we will work with you to try and resolve this claim. With this in mind, we look forward to receiving the requested information, and we welcome the opportunity to discuss this case with you soon.

- 16 -

One of the tools that our claim personnel may use in evaluating the claim is a computer program known as Colossus, licensed by Computer Sciences Corporation. Colossus uses a broad range of information about your injury, treatment, and prognosis to determine the severity of your client's injury. Based on this information, Colossus makes a recommendation as to the value of your client's injury. The Colossus recommendation is only one factor among many that our adjusters consider in reaching a decision as to the overall evaluation of the claim. It is their goal to reach that decision promptly, fairly, and based on an appropriate investigation of the facts and circumstances of your client's claim.

If you would like to discuss any aspect of this claim, including this letter, please feel free to call me at the number listed below. Thank you.

Sincerely,


First Name and Last Name
Direct Dial Phone Number
Allstate Insurance Company

- 17 -

**EXHIBIT C – Attachment 2**
**<u>Notice to Repped BI Claimant</u>**

MCO Name
MCO Address
City, State, Zip



[RECIPIENT FNAME] [RECIPIENT LNAME]
[RECIPIENT ADDRESS]
CITY STATE ZIP

Current Date

INSURED:  [INSD FN INSD LN]             PHONE NUMBER:  [Office 1-800]
DATE OF LOSS:  [S-DOL]                  FAX NUMBER:
CLAIM NUMBER:  [S-Claim # & Desk Loc]    OFFICE HOURS:
YOUR CLIENT:  [S-InvdID FN & LN] Allow up to 4
YOUR CASE NUMBER: [M insert case number]

## Re:  Important Information Regarding Your Client's Bodily Injury Claim

Dear [Recipient FN & LN]:

We received notice that you are representing [S-Invid Name Clmt FN & LN].

To expedite the processing of this claim, please provide me with the items listed below:

- Your client's information, such as their complete name, address, marital status, date of birth, social security number and a description of the injury alleged from the accident.
- A signed [S-based on UI Choice C3488 = Med & Wage Auth OR C2255 = Med Auth].
- The name, address and phone number of all physicians and medical care facilities that have relevant information about your client(s).
- The name, address and phone number of your client's employer, along with a letter from the employer confirming the amount of lost wages.
- Copies of your client's medical bills and a report including the ICD-9 diagnosis codes and/or CPT-4 procedure codes associated with treatment or services rendered for your client's alleged injury.
- [M-FF Text]

If your client presents a property claim, we will need your authorization to inspect your client's vehicle. Please keep in mind that you must notify us if your client needs substitute transportation while a shop repairs their vehicle. We will pay the comparable rental rate plus tax for your area. Your client will be solely responsible for paying for fuel and mileage costs.

We appreciate your assistance in providing us with all the necessary information to resolve this claim in a timely manner.

One of the tools that our claim personnel may use in evaluating your client's claim is a computer program known as Colossus, licensed by Computer Sciences Corporation. Colossus uses a broad range of information about your client's injury, treatment, and prognosis to determine the severity of your client's injury. Based on this information, Colossus makes a recommendation as to the value of your client's injury. The Colossus recommendation is only one factor among many that our adjusters consider in reaching a decision as to the overall evaluation of the claim. It is their goal to reach that decision promptly, fairly, and based on an appropriate investigation of the facts and circumstances of your client's claim.

If you would like to discuss any aspect of this claim, including this letter, please feel free to call me at the number listed below. Thank you.

Sincerely,

First Name and Last Name
Direct Dial Phone Number
Allstate Insurance Company

**EXHIBIT C – Attachment 3**
**Notice to Unrepped UM/UIM Claimant**



MCO Name
MCO Address
City, State, Zip


[RECIPIENT FNAME] [RECIPIENT LNAME]
[RECIPIENT ADDRESS]
CITY STATE ZIP


Current Date

| | |
|---|---|
| INSURED: [INSD FN INSD LN] | PHONE NUMBER: [Office 1-800] |
| DATE OF LOSS: [S-DOL] | FAX NUMBER: |
| CLAIM NUMBER: [S-Claim # & Desk Loc] | 1. OFFICE HOURS: |

**Re: Important Information Regarding Your**
**[Uninsured/Underinsured] Motorist Bodily Injury Claim**


Dear [Recipient FN & LN]:

I am sorry to hear of your recent injury, and I want to wish you a speedy recovery. Please rest assured that I will do my best to handle your claim as quickly as possible.

I want to let you know that in addition to any no-fault Personal Injury Protection or Medical Payment benefits that may be available, you may also be entitled to Uninsured Motorist coverage. Before I can begin processing your [Uninsured/Underinsured] Motorist Bodily Injury claim, I ask that you please complete the following steps:

- Sign and return the enclosed Medical and Wage Authorization forms. This will allow me to obtain information, such as office notes and medical reports, about the diagnosis and treatment of your injuries. I will also have authorization to verify your income loss with your employer.

One of the tools that our claim personnel may use in evaluating your claim is a computer program known as Colossus, licensed by Computer Sciences Corporation. Colossus uses a broad range of information about your injury, treatment, and prognosis to determine the severity of your injury. Based on this information, Colossus makes a recommendation as to the value of your injury. The Colossus recommendation is only one factor among many that our adjusters consider in reaching a decision as to the overall evaluation of the claim. It is their goal to reach that decision promptly, fairly, and based on an appropriate investigation of the facts and circumstances of your claim.

If you have any questions, please feel free to call me at [S-Clm Rep Direct Ph #]. Thank you.

Sincerely,

First Name and Last Name
Direct Dial Phone Number
Allstate Insurance Company

**EXHIBIT C – Attachment 4**
**Notice to Unrepped BI Claimant**

MCO Name
MCO Address
City, State, Zip



[CLAIMANT FNAME] [CLAIMANT LNAME]
[CLAIMANT ADDRESS]
[CLAIMANT CITY STATE ZIP]

Current Date

INSURED: [INSD FN INSD LN]
DATE OF LOSS: [S-DOL]
CLAIM NUMBER: [S-Claim # & Desk Loc]

## Re: Important Information Regarding your Bodily Injury Claim

Dear [Claimant FN & LN]:

I am writing to let you know that I am involved in the handling of the [S-Bodily Injury] claim listed above.

Before I can begin processing your Bodily Injury claim, can you please complete the following steps:

- Sign and return the enclosed Medical and Wage/Employer Authorization forms. This will allow me to obtain information, such as office notes and medical reports, about the diagnosis and treatment of your injuries. I will also have authorization to verify your lost income with your employer.

- Sign and return the Medical Provider/Employer Information form. This will allow me to request medical reports and records necessary to process your claim. Please be sure to also send me any medical bills you have received for treatment of your injuries related to this loss.

Once we receive all the completed forms, we can begin gathering all the documentation we need to review your injury claim.

One of the tools that our claim personnel may use in evaluating your claim is a computer program known as Colossus, licensed by Computer Sciences Corporation. Colossus uses a broad range of information about your injury, treatment, and prognosis to determine the severity of your injury. Based on this information, Colossus makes a recommendation as to the value of your injury. The Colossus recommendation is only one factor among many that our adjusters consider in reaching a decision as to the overall evaluation of the claim. It is their goal to reach that decision promptly, fairly, and based on an appropriate investigation of the facts and circumstances of your claim.

If you would like to discuss any aspect of this claim, including this letter, please feel free to call me at the number listed below. Thank you.

Sincerely,

First Name and Last Name
Direct Dial Phone Number
Allstate Insurance Company

# EXHIBIT D

## Prospective Allstate Process for Colossus Tuning Analysis

1) The Home Office Casualty Claim Director initiates a tuning analysis to be conducted every twelve to eighteen months to ensure that Colossus recommendations reflect current values in each economic region. The goal is to meet a payment rate as close to 1.00 as possible with no more than 50% of closed claims above the Colossus recommendation. Payment rate for any group of claims is defined as the sum of the loss dollars paid divided by the sum of the Colossus recommendations.

2) The Home Office Casualty Sr. Manager and/or Delegate sends a memo directed to the Claim Field Directors (CFDs) and Casualty Process Specialists (CPSs) advising them that the tuning analysis process is beginning. Included in this memo is the purpose of the tuning analysis process, the timeline, and any steps they may need to take to assist in completing the process.

3) The Home Office Casualty Sr. Manager and/or Delegate contacts Claim Technology Services (CTS) to initiate the tuning analysis audit process.

   The Home Office Casualty Sr. Manager and/or Delegate and CTS will run an audit on all claims closed where Colossus was used in the evaluation process from the last tuning period to the present excluding:

   i) Claims where the loss payment amount is zero;
   ii) Claims where the loss payment is less than or equal to the special damages entered into Colossus;
   iii) Claims where there is comparative negligence;
   iv) Claims where there is contribution;
   v) Claims where disfigurement amount entered into Colossus is either greater than or equal to $5000 or when the disfigurement is 50% or more of the Colossus recommendation for general damages;
   vi) Claims where the loss payment amount equals and/or exceeds the policy limit.

4) Once this initial audit is run and validated by both CTS and Home Office Claims, a second audit is run on all claims which appear on the first audit as outlined in #3 to exclude claims where the loss payment amount to the Colossus value (high) is +/- 3 standard deviations or more from the median of the overall population of claims appearing on the first audit.

5)   Once this second audit is run and validated by both CTS and Home Office Claims, a third audit is run on all claims which appear on the second audit as outlined in #4 to identify claims for potential removal where the loss payment is greater than or equal to 50% above or below the Colossus value (high).

6)   The claims which appear on the audit outlined in #5 will then be separated into individual audits for each economic (tuning) region.

7)   The Home Office Casualty Sr. Manager and/or Delegate will distribute a memo to each CPS with specific instructions for reviewing all claims identified for potential removal (step #5) for each economic region in their CSA.  Each CPS is responsible for reviewing these identified claims to ensure that their removal for the tuning analysis process is appropriate. The only claims that are appropriate for removal are ones where the loss payment is significantly influenced by factors other than those considered by the Colossus software. The results of this review along with specific comments will be sent to the Home Office Casualty Sr. Manager and/or Delegate.  The Home Office Casualty Sr. Manager and/or Delegate is responsible for reviewing the comments submitted by each CPS and for re-reviewing a minimum of 10% of the claims which are to be excluded from the tuning analysis process for consistency and accuracy.

8)   The Home Office Casualty Sr. Manager and/or Delegate will determine an appropriate statistical sample size to achieve at least a 95% confidence level for each economic region, using approved sampling software.

9)   The Home Office Casualty Sr. Manager and/or Delegate will then send the final audits to CSC which will then merge the Allstate and Encompass data.

10)  The Home Office Casualty Sr. Manager and/or delegate will review each merged tuning macro to determine whether an adjustment to the tuning curve is warranted.  If the payment rate is below .98 or above 1.02, an adjustment to the tuning curve is generally made.  In the event that no tuning adjustment has been made in an economic region for two consecutive tuning periods, the Home Office Casualty Director and/or AVP will have a targeted review conducted of the evaluation process in that economic region.

11)  In the event that an adjustment to the tuning curve is to be made, CSC is instructed to provide recommendations for tuning as close to a payment rate of 1.0 as possible with no more than 50% of loss payments above the retuned Colossus recommendations.

a)   CSC will provide a scattergraph and tiered analysis of closed claim data.  If the payment rate is between .98 and 1.02, a decision may be made by Home Office Casualty Sr. Manager and/or delegate not to adjust tuning.

    b)  While CSC is utilized to make tuning curve recommendations, the decision to adjust a tuning curve is made by the Home Office Casualty Sr. Manager and/or delegate.

12)  Once final tuning decisions are made, the Home Office Casualty Sr. Manager and/or delegate loads the changes into the Colossus tuning toolkit.

13)  Home Office Casualty Claims will review 10% of the changes that were loaded into the Colossus tuning toolkit to ensure accuracy.

14)  Once all the tuning changes have been completed and loaded into the Colossus tuning toolkit, Home Office Casualty Sr. Manager and/or Delegate advises the Claim Process Specialist that the changes have been loaded.  A tuning summary is also created to document any changes that have been made to tuning and the percent of that change.

15)  Home Office Casualty Claims will maintain in a read-only format the official archived copy of the Tuning Macro Report provided in CSC's publication for using the Tuning Macro.

16)  Internal Audit will conduct a review which will focus on the process used by management to ensure Colossus is being tuned according to the above guidelines.

Additional considerations:

1)  Home Office Claims will determine if a new tuning region needs to be created when the loss payment values in a specific geographical area within one tuning region are significantly different than the loss payments in the rest of the tuning region.  The Colossus tuning toolkit is used to add a new economic region.  The new tuning region is established using the existing tuning for that location.  After sufficient data is collected, reports are run and a tuning analysis is completed as outlined above.

2)  Tuning regions may need to be merged, if loss payment values in adjoining geographical areas but different tuning regions are similar.  A tuning region being removed is deleted using the Colossus tuning toolkit.

3)  Impairment Tuning

    a)  A separate tuning process is used to establish the relationship between impairment ratings and regular trauma.

    b)  The impairment tuning process begins with a benchmark session involving experienced field and Home Office claim employees who handle injury claims where significant trauma and impairment exist.

    c)  The benchmark session consists of discussion of a number of injury scenarios involving impairment provided by CSC to develop consensus values for each injury scenario.

d) Benchmark sessions will be conducted in each tuning region utilizing experienced field Claim employees.  Home Office Claim Employees who manage significant injury claims will oversee and participate in each benchmark session for assigned economic regions.

e) CSC takes the consensus values and generates an impairment tuning curve for each economic region which relates whole person impairment ratings to dollar amounts.

f) The impairment tuning process is scheduled to be completed in 2012; it is anticipated that this benchmark tuning process will be completed at least every 5 years.

## EXHIBIT E

## Internal Audit

Internal Audit will conduct the following reviews to assess the risks and controls associated with bodily injury claim handling.

**Claim Evaluation Process**

Reviews will be performed to confirm that effective controls have been implemented that ensure claims are being properly evaluated, with a focus on:

- Whether the appropriate evaluation tool was used in the claim adjustment process. Claims will be sampled to confirm they were evaluated as outlined by claims processes and focus on the reliability of management's controls which ensure the process is working as intended.
- Whether the role of the Evaluation Consultant is operating as intended.
- Whether Evaluation Consultants have conducted required file reviews.
- Whether data utilized in the evaluation process has been accurately input into the system.
- Whether guidelines regarding file documentation are being followed.

**Colossus Tuning Analysis**

Reviews will be performed of the process used by management to ensure the Colossus software program is being tuned according to the established guidelines with a focus on:

- The methodology used in the tuning process. This will include a review to confirm Home Office Claims approved sampling software was utilized and that Home Office Claims was involved in determining the appropriate sample.
- Whether the process used to identify claims to be removed from the sample was completed according to guidelines.

- Whether Home Office Claims has performed a review of at least 10% of the claims used in the tuning process.
- Whether the transfer of data was completed accurately.

An audit report will be issued with an audit opinion of the internal controls which mitigate certain risks associated with the two processes above. This report will be directed to the Officers responsible for the handling of bodily injury claims with a copy to the Senior Vice President of Claims, the Chief Financial Officer, and certain members from the law and regulation and compliance areas.

# EXHIBIT F

### Regulatory Fund Distribution Formula

### Step One – Calculate State Allocation Percentage

**Allstate Private Passenger Automobile Liability Premium in Signatory State/**
**Allstate Private Passenger Automobile Liability Premium**
**in All Signatory States**

### Step Two – Calculate State Allocation

**Multiply $9.8 Million by Percentage from Step One**

# EXHIBIT G

### Allstate Private Passenger Auto Liability Premium for Year End 2009

| Geographic Location | TOTALS WRITTEN PREMIUM | % to Overall Total |
|---|---|---|
| Alaska, US | 65,318,006 | 0.3852% |
| Alabama, US | 233,674,863 | 1.3781% |
| Arkansas, US | 103,716,934 | 0.6117% |
| Arizona, US | 332,627,884 | 1.9617% |
| California, US | 1,638,510,770 | 9.6632% |
| Colorado, US | 216,200,706 | 1.2751% |
| Connecticut, US | 289,498,901 | 1.7073% |
| District of Columbia, US | 19,792,786 | 0.1167% |
| Delaware, US | 37,552,301 | 0.2215% |
| Florida, US | 1,717,194,399 | 10.1273% |
| Georgia, US | 676,737,639 | 3.9911% |
| Hawaii, US | 51,885,484 | 0.3060% |
| Iowa, US | 35,016,943 | 0.2065% |
| Idaho, US | 66,256,453 | 0.3908% |
| Illinois, US | 671,921,648 | 3.9627% |
| Indiana, US | 184,530,522 | 1.0883% |
| Kansas, US | 63,301,129 | 0.3733% |
| Kentucky, US | 164,720,501 | 0.9715% |
| Louisiana, US | 427,877,996 | 2.5234% |
| Massachusetts, US | 50,495,586 | 0.2978% |
| Maryland, US | 467,434,130 | 2.7567% |
| Maine, US | 50,935,042 | 0.3004% |
| Michigan, US | 357,591,690 | 2.1089% |
| Minnesota, US | 136,326,296 | 0.8040% |
| Missouri, US | 118,399,111 | 0.6983% |
| Mississippi, US | 117,975,608 | 0.6958% |
| Montana, US | 26,794,344 | 0.1580% |
| North Carolina, US | 403,832,968 | 2.3816% |
| North Dakota, US | 5,247,082 | 0.0309% |
| Nebraska, US | 35,715,995 | 0.2106% |
| New Hampshire, US | 59,840,334 | 0.3529% |
| New Jersey, US | 865,949,034 | 5.1070% |
| New Mexico, US | 107,725,047 | 0.6353% |
| Nevada, US | 178,340,291 | 1.0518% |
| New York, US | 1,859,173,037 | 10.9646% |
| Ohio, US | 484,029,358 | 2.8546% |
| Oklahoma, US | 144,553,688 | 0.8525% |
| Oregon, US | 163,602,422 | 0.9649% |
| Pennsylvania, US | 919,529,951 | 5.4230% |
| Rhode Island, US | 91,190,358 | 0.5378% |
| South Carolina, US | 395,958,160 | 2.3352% |
| South Dakota, US | 2,685,539 | 0.0158% |
| Tennessee, US | 205,221,702 | 1.2103% |
| Texas, US | 1,521,748,050 | 8.9746% |
| Utah, US | 187,411,105 | 1.1053% |
| Virginia, US | 416,577,657 | 2.4568% |
| Vermont, US | 23,809,278 | 0.1404% |
| Washington, US | 379,645,432 | 2.2390% |
| Wisconsin, US | 82,671,949 | 0.4876% |
| West Virginia, US | 85,130,939 | 0.5021% |
| Wyoming, US | 14,245,797 | 0.0840% |
| TOTALS | 16,956,122,845 | 100.0000% |

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of [Insert the Jurisdiction and Insurance Regulatory Agency], I, [Insert name of insurance regulatory official executing the Agreement], hereby adopt, agree, and approve this Agreement.

[NAME OF INSURANCE REGULATORY AGENCY]

By:_____

[Name of Regulatory Official], [Title],

Printed Name: _____

Date_____

- 32 -

IN THE MATTER OF MULTI-STATE MARKET CONDUCT REGULATORY
AGREEMENT FOR ALLSTATE INSURANCE COMPANY

PARTICIPATING REGULATOR ADOPTION

On behalf of the Alaska Division of Insurance, I, Linda S. Hall, hereby adopt, agree, and
approve this Agreement.

Dated:  September 28, 2010

Linda S. Hall
Director
Division of Insurance
Department of Commerce, Community,
& Economic Development

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of [Insert the Jurisdiction and Insurance Regulatory Agency], I, [Insert name of insurance regulatory official executing the Agreement], hereby adopt, agree, and approve this Agreement.

[NAME OF INSURANCE REGULATORY AGENCY]

By:

[Name of Regulatory Official], [Title]

Printed Name: Jim L. Ridling

Date 09/17/10

- 32 -

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of the Arizona Department of Insurance, I, Christina Urias, hereby adopt, agree, and approve this Agreement.

Arizona Department of Insurance

By: _____

Christina Urias, Director

Date _____ 9-24-10 _____

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of the **Arkansas Insurance Department**, I, **Jay Bradford**, hereby adopt,

agree, and approve this Agreement.


ARKANSAS INSURANCE DEPARTMENT


By: _____ Commissioner

Printed Name:___Jay Bradford_____

Date:____10 · 5 · 10_____

## EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

On behalf of the California Department of Insurance, I, Patricia K. Staggs, Deputy General Counsel, hereby adopt, agree, and approve this Agreement with the following modifications to the terms of Section IV.A.2:

The allocation to be paid to California as a Signatory Regulator will be transmitted to the State Treasury for deposit in the General Fund pursuant to California Insurance Code (CIC) §§ 12921(b) and 12975.7(a).

CALIFORNIA DEPARTMENT OF INSURANCE

By: _____

Printed Name: Patricia K. Staggs, Deputy General Counsel

Date: Oct 12, 2010

AGREED TO BY:

Allstate Insurance Company and its Affiliates

_____
David G. Nadig
Vice President and Deputy General Counsel

Date: 10/14/2010

Illinois Department of Insurance, on behalf of the Lead Regulators

Signature: _____

Printed Name: _____

Title: _____

Date: _____

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of Connecticut Insurance Department, I, Thomas R. Sullivan, hereby adopt,

agree, and approve this Agreement

CONNECTICUT INSURANCE DEPARTMENT

By: _____

Thomas R. Sullivan, Insurance Commissioner

Printed Name: _____

Date: _____9/27/10_____

-32-

# EXHIBIT H
## Participating Regulator Adoption
## Multi-State Market Conduct Regulatory Agreement
## Allstate Insurance Companies and Affiliates Listed on Exhibit A

On behalf of Delaware Department of Insurance  I, Linda Nemes  hereby adopt, agree, and

approve this Agreement.


[NAME OF INSURANCE REGULATORY AGENCY]


By: _Linda Nemes  Sr Ins Research Analyst_

[Name of Regulatory Official], [Title],

Printed Name: _Linda Nemes_

Date _10 | 5 | 2010_

**Illinois Department of Insurance**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**Florida Office of Insurance Regulation**

Signature_____

      Printed Name _Kevin M. McCarty_

      Title _Insurance Commissioner_

      Date _9/3/2010_

**New York State Insurance Department**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**Iowa Insurance Division**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**Participating Regulator Adoption**

On behalf of the Georgia Insurance Department, I, John W.
Oxendine, hereby adopt, agree, and approve this Agreement,
subject to the modification attached herewith.

By: _____

John W. Oxendine
Commission of Insurance
State of Georgia

Date: __10 - 5 - 2010_____

## Modification to Agreement

By this modification, all matters currently being examined by the Georgia Department of Insurance under examination certificate 2010-10-MC, attached herewith, are expressly excluded from the Resolution clause of section IV.B.1 of the Agreement.

**Executed by:**

**Allstate Insurance Company and its Affiliates**

_____

David G. Nadig
Vice President and Deputy General Counsel

Date:_____

**Georgia Department of Insurance**

By_____

John W. Oxendine
Commission of Insurance
State of Georgia

Date:  10 - 5 - 2010_____

## EXHIBIT H
### Participating Regulator Adoption
### Multi-State Market Conduct Regulatory Agreement
### Allstate Insurance Companies and Affiliates Listed on Exhibit A

On behalf of the State of Hawaii Insurance Division, I, Gordon I.Ito, hereby adopt, agree, and approve this Agreement.


HAWAII INSURANCE DIVSION


By:_____

Gordon I. Ito, Insurance Commissioner,

Printed Name: Gordon I. Ito_____

Date____10/6/10_____

# AGREEMENT OF PARTICIPATION
# ALLSTATE
# COLLABORATIVE ACTION

On behalf of ___State of Hawaii Insurance Division___
        (Jurisdiction and Regulatory Agency)

I hereby adopt, agree, and approve the participation of my state in the above named Collaborative Action.

___Hawaii Insurance Division___
(Name of Insurance Regulatory Agency)

BY: _____
        (Signature)

DATE: ___10/6/10___

___Gordon I. Ito___
(Printed name of executing regulatory official)

___Insurance Commissioner___
(Printed Title)

**Note: In the case of fines, penalties and/or restitution resulting from this Collaborative Action, please provide a** contact name and mailing address **to which your state's Allocation amount should be sent from the Company. Also include any specific language or budgetary code that needs to be included on the check.**

| PENALTIES/FINES | RESTITUTION |
|---|---|
| ___Colin Hayashida___ | ___Colin Hayashida___ |
| (Name/Department) | (Name/Department) |
| ___Hawaii Insurance Division___ | ___Hawaii Insurance Division___ |
| (Mailing Address 1) | (Mailing Address 1) |
| ___P.O. Box 3614___ | ___P.O. Box 3614___ |
| (Mailing Address 2) | (Mailing Address 2) |
| ___Honolulu, HI   96811___ | ___Honolulu, HI   96811___ |
| (Mailing Address 3) | (Mailing Address 3) |
| _____ | _____ |
| (Accounting Code or Language) | (Accounting Code or Language) |

**Illinois Department of Insurance**

Signature _____

Printed Name _Michael M'Raith_

Title _Director_

Date _8-27-10_

**Florida Office of Insurance Regulation**

Signature _____

Printed Name _____

Title _____

Date _____

**New York State Insurance Department**

Signature _____

Printed Name _____

Title _____

Date _____

**Iowa Insurance Division**

Signature _____

Printed Name _____

Title _____

Date _____

- 12 -

STATE OF INDIANA     )
                      ) SS:
COUNTY OF MARION    )

BEFORE THE INDIANA

COMMISSIONER OF INSURANCE

CAUSE NUMBER:  7182-MC10-0930-003

IN THE MATTER OF:           )
                            )
Allstate Insurance Company     )
2775 Sanders Road, Suite A4     )
Northbrook, Illinois 60062      )
                            )
                            )
Multi-State Market Conduct Regulatory  )
Agreement                    )

**FILED**

OCT 0 6 2010

**STATE OF INDIANA
DEPT. OF INSURANCE**

## PARTICIPATING REGULATOR ADOPTION AND ORDER

This Participating Regulator Adoption and Order is filed pursuant to Ind. Code § 27-1-1-1 *et.seq.* and results from the State of Indiana Insurance Commissioner's ("Commissioner") consideration of the Multi-State Market Conduct Regulatory Agreement ("Agreement") with Allstate Insurance Company, a licensed insurance company domiciled in the state of Illinois and doing business in the state of Indiana.

WHEREAS, Allstate Insurance Company and its Affiliates (collectively, "Allstate") entered into a Multi-State Market Conduct Regulatory Agreement with the Commissioner of the Florida Office of Insurance Regulation, the Director of the Illinois Department of Insurance, the Commissioner of the Iowa Insurance Division, and the Superintendent of the New York State Insurance Department (collectively the Lead Regulators") and the insurance regulators of the remaining jurisdictions and the District of Columbia that agree to approve the Agreement.

WHEREAS, the terms and conditions of the document entitled "MULTI-STATE MARKET CONDUCT REGULATORY AGREEMENT" is incorporated by reference and attached as Exhibit 1.

IT IS THEREFORE ORDERED by the Commissioner that the Agreement is hereby approved and adopted.

Stephen W. Robertson, Acting Commissioner of Insurance
Indiana Department of Insurance
311 West Washington Street, Suite 300
Indianapolis, Indiana 46204

Distribution:

Debra M. Webb
Indiana Department of Insurance
311 West Washington Street, Suite 300
Indianapolis, IN 46204

**Illinois Department of Insurance**

Signature_____

    Printed Name_____

    Title_____

    Date_____

**Florida Office of Insurance Regulation**

Signature_____

    Printed Name_____

    Title_____

    Date_____

**New York State Insurance Department**

Signature_____

    Printed Name_____

    Title_____

    Date_____

**Iowa Insurance Division**

Signature _Susan E. Voss_

    Printed Name _Susan E. Voss_

    Title _Iowa Insurance Commissioner_

    Date _8/30/10_

- 12 -

## PARTICIPATING REGULATOR ADOPTION

On behalf of the State of Kansas, I, Sandy Praeger, hereby adopt, agree, and approve this

Agreement.

KANSAS INSURANCE DEPARTMENT

By: *Sandy Praeger*

Printed Name: Sandy Praeger, Commissioner of Insurance

Date: 9 - 28 - 10

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of the Kentucky Department of Insurance, I, Sharon Clark, Commissioner, hereby adopt, agree, and approve this Agreement.

Kentucky Department of Insurance

By: _Sharon P. Clark_

Sharon Clark, Commissioner

Printed Name: _Sharon P. Clark_

Date: _9-15-10_

## EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

On behalf of the Maryland Insurance Administration, I, Beth Sammis, hereby adopt, agree, and approve this Agreement.


Maryland Insurance Administration


By: _____

Printed Name:  Beth Sammis

Date:  September 24, 2010

- 32 -

# EXHIBIT H
## Participating Regulator Adoption
## Multi-State Market Conduct Regulatory Agreement
## Allstate Insurance Companies and Affiliates Listed on Exhibit A

On behalf of the Commonwealth of Massachusetts Division of Insurance, I, Joseph G. Murphy,

Commissioner of Insurance, hereby adopt, agree, and approve this Agreement.

Commonwealth of Massachusetts Division of Insurance

By:

Joseph G. Murphy, Commissioner

Printed Name: JOSEPH  G.  MURPHY

Date  10/14/10.

## EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

On behalf of the State of Michigan, Office of Financial and Insurance Regulation, I, Ken Ross,

hereby adopt, agree, and approve this Agreement.


OFFICE OF FINANCIAL AND INSURANCE REGULATION

By: _____

Ken Ross,
Commissioner of Financial and Insurance Regulation

Date  *10-6-10*  _____

## EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

*Mississippi Insurance Department*

On behalf of [Insert the Jurisdiction and Insurance Regulatory Agency], I, [Insert name of

*Commissioner Mike Chaney*

insurance regulatory official executing the Agreement], hereby adopt, agree, and approve this

Agreement.

*Mississippi Insurance Department*

[NAME OF INSURANCE REGULATORY AGENCY]

By: _____   *Commissioner*

[Name of Regulatory Official], [Title],

Printed Name: __M I C H A E L J . C H A N E Y__

Date __Sept. 10, 2010__

- 32 -

# AGREEMENT OF PARTICIPATION
# ALLSTATE
## COLLABORATIVE ACTION

On behalf of   <u>Mississippi Insurance Department</u>
(Jurisdiction and Regulatory Agency)

I hereby adopt, agree, and approve the participation of my state in the above named
Collaborative Action.

<u>Mississippi Insurance Department</u>
(Name of Insurance Regulatory Agency)

BY: _____
(Signature)

DATE: _Sept. 10, 2010_

_MICHAEL J. CHANEY_
(Printed name of executing regulatory official)

_Commissioner of Insurance -_
(Printed Title) _Mississippi_

**Note: In the case of fines, penalties and/or restitution resulting from this Collaborative
Action, please provide a <u>contact name and mailing address</u> to which your state's
Allocation amount should be sent from the Company. Also include any specific language
or budgetary code that needs to be included on the check.**

<u>PENALTIES/FINES</u>                          <u>RESTITUTION</u>

_Mississippi Insurance Department_
(Name/Department)                               (Name/Department)

_P O Box 79, Jackson MS 39205-0079_
(Mailing Address 1)                             (Mailing Address 1)

_____            _____
(Mailing Address 2)                             (Mailing Address 2)

_____            _____
(Mailing Address 3)                             (Mailing Address 3)

_____            _____
(Accounting Code or Language)                   (Accounting Code or Language)

## EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

On behalf of the State of Nevada, Department of Business and Industry, Division of Insurance, I, Brett J. Barratt, Commissioner of Insurance, hereby adopt, agree, and approve this Agreement.

STATE OF NEVADA,
DEPARTMENT OF BUSINESS AND INDUSTRY,
DIVISION OF INSURANCE

By: _____
            BRETT J. BARRATT
      COMMISSIONER OF INSURANCE

Printed Name: _____

Date: _____

Nevada Cause No. 10.0456

# EXHIBIT H

## ALLSTATE INSURANCE COMPANY AND ITS AFFILIATES

## PARTICIPATING REGULATOR ADOPTION

On behalf of the New Hampshire Insurance Department, I, Roger A. Sevigny, hereby

adopt, agree, and approve this Agreement.


NEW HAMPSHIRE INSURANCE DEPARTMENT

By: _____

Roger A. Sevigny, Commissioner
New Hampshire Insurance Department

Printed Name: _ROGER   SEVIGNY_

Date:  October 5, 2010

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of New Mexico Department of Insurance, I, John Franchini, hereby adopt, agree, and approve this Agreement.

New Mexico Department of Insurance]

By: _____

Superintendent of Insurance, Department of Insurance of New Mexico,

Printed Name: _____John Franchini_____

Date _____ Oct. 20, 2010_____

- 32 -

## PARTICIPATING REGULATOR ADOPTION
## ALLSTATE INSURANCE COMPANY

On behalf of the New Jersey Department of Banking and Insurance, I, Thomas B.
Considine, hereby adopt, agree and approve this Agreement

New Jersey Department of Banking and Insurance

By: _____

Thomas B. Considine, Commissioner

Printed Name: _Tom Considine_

Date: _9/23/10_

**Illinois Department of Insurance**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**Florida Office of Insurance Regulation**

Signature_____

      Printed Name_____

      Title_____

      Date_____

**New York State Insurance Department**

Signature_____

      Printed Name _James J Wrynn_

      Title _Superintendent_

      Date _Sep 7, 2010_

**Iowa Insurance Division**

Signature_____

      Printed Name_____

      Title_____

      Date_____

## EXHIBIT H
### Participating Regulator Adoption
### Multi-State Market Conduct Regulatory Agreement
### Allstate Insurance Companies and Affiliates Listed on Exhibit A

On behalf of the North Carolina Department of Insurance, I, Ernest L. Nickerson, hereby adopt,

agree, and approve this Agreement.


North Carolina Department of Insurance

By: _Ernest L. Nickerson_

Ernest L. Nickerson, Senior Deputy Commissioner - Technical Services Group

Printed Name: _ERNEST L. Nickerson_

Date _10/7/2010_

# EXHIBIT H

## PARTICIPATING REGULATOR ADOPTION

On behalf of the North Dakota Insurance Department, I, Adam Hamm, hereby adopt, agree, and approve this Agreement.

North Dakota Insurance Department

By: _____
       Adam Hamm, Commissioner

Printed Name:    Adam Hamm

Date:    9-16-10

STATE OF OHIO
DEPARTMENT OF INSURANCE

| | | |
|---|---|---|
| IN THE MATTER OF: | : | MARY JO HUDSON |
| | : | SUPERINTENDENT OF INSURANCE |
| MULTI-STATE MARKET CONDUCT | : | |
| EXAMINATION OF ALLSTATE INSURANCE | : | ORDER ADOPTING REGULATORY |
| COMPANY AND CERTAIN AFFILIATES | : | SETTLEMENT AGREEMENT |

WHEREAS, the Insurance Commissioner of the State of Florida Office of Insurance Regulation, the Director of the Illinois Department of Insurance, the Commissioner of the Iowa Insurance Division and the Superintendent of the New York State Insurance Department (collectively, the "Lead Regulators") have conducted a targeted multi-state market conduct examination ("Examination") of the Allstate Insurance Company and certain affiliates ("Allstate"). The Examination focused primarily on Allstate's bodily injury claims practices from the mid-1990's to the present, including its use of computer systems to settle such claims. The Examination included, among other things, a review of Allstate's use of claims handling software, particularly the Colossus software program licensed by Allstate from Computer Sciences Corporation, as a tool in determining payment amounts for claims, Allstate's training, performance evaluation and compensation of claims personnel, and Allstate's handling of bodily injury claims where the claimant was represented by an attorney;

WHEREAS, the Lead Regulators and the insurance regulators of each of the remaining states and the District of Columbia that agree to approve the Multi-State Market Conduct Regulatory Settlement Agreement (the "Participating Regulators") (collectively the Lead Regulators and Participating Regulators are referred to as "Signatory Regulators") have entered into a Multi-State Market Conduct Regulatory Settlement Agreement ("Agreement") with Allstate to resolve all matters set forth in Sections II and III of the Agreement;

WHEREAS, as described in the Agreement, based on review of the materials, information and documents produced in the course of the Examination, no institutional issues involving underpayment of claims were identified. The Examination however, determined the need for enhanced management oversight of Allstate's use of the Colossus software program; and

WHEREAS, the Agreement, among other things, requires changes to certain business practices that Allstate agrees to undertake with respect to its use of the Colossus software program in the adjustment of bodily injury claims, as well as a process for measuring compliance with the Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Agreement entered into between Allstate and the Signatory Regulators is approved and adopted.

IT IS HEREBY FURTHER ORDERED that Allstate shall immediately initiate compliance with all terms and conditions of the Agreement and follow all recommendations set forth in the Agreement.

Dated: 4 October 2010

MARY JO HUDSON
Superintendent of Insurance

## **EXHIBIT H**

### **PARTICIPATING REGULATOR ADOPTION**

On behalf of the State of Ohio, Department of Insurance, I, Mary Jo Hudson, hereby adopt,

agree, and approve this Agreement.

OHIO DEPARTMENT OF INSURANCE

By:   _____
      Mary Jo Hudson, Superintendent of Insurance

Printed Name:  Mary Jo Hudson

Date:   4 October 2010

## EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

On behalf of the Oklahoma Insurance Department, I, Darren Ellingson, Deputy Oklahoma Insurance Commissioner, hereby adopt, agree, and approve this Agreement.

OKLAHOMA INSURANCE DEPARTMENT

By: _Darren Ellingson_

DARREN ELLINGSON, DEPUTY OKLAHOMA INSURANCE COMMISSIONER

Printed Name: _Darren Ellingson_

Date _10 / 1 / 10_

## STATE OF OREGON
## DEPARTMENT OF CONSUMER AND BUSINESS SERVICES
## INSURANCE DIVISION

In the Matter of **Allstate Insurance Company** *et al.*  )   **FINAL ORDER**
                                                              )   Case No. INS 10-09-021

    Pursuant to Oregon Revised Statutes (ORS) 731.256, the Director of the Oregon Department of Consumer and Business Services (director) commenced this administrative proceeding to take enforcement action against Allstate Insurance Company and certain affiliates (collectively referred to as Allstate).

    Pursuant to ORS 183.415(5), the director adopts, agrees with, and incorporates herein by this reference, the attached regulatory settlement agreement signed by Allstate on 8/27/10, and if the agreement becomes effective then orders that the following action be taken.

## Action

    Allstate shall comply with the agreement as it applies to Oregon.

Dated    **SEP 2 3 2010**           _____

                                       Cory Streisinger
                                       Director
                                       Department of Consumer and Business Services

//
//
//

## PARTICIPATING REGULATOR ADOPTION

On behalf of State of Oregon, I, Cory Streisinger, hereby adopt, agree, and approve

this Agreement.

Department of Consumer and Business Services

By: _____

Cory Streisinger, Director
Date **SEP 2 3 2010** _____

//
//
//

- 32 -

## EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

On behalf of the Pennsylvania Insurance Department, I, Robert L. Pratter, hereby

adopt, agree, and approve this Agreement.

Pennsylvania Insurance Department

By: _Robert L. Pratter_

Title: _Acting Insurance Commissioner_

Printed Name: _Robert L. Pratter_

Date: _9/22/10_

## PARTICIPATING REGULATOR ADOPTION

On behalf of the Rhode Island Department of Business Regulation, Division of Insurance, I , Joseph Torti III, hereby adopt, agree, and approve the Multistate Regulatory Settlement Agreement between Allstate Insurance Company and various state insurance regulators.

Rhode Island Department of Business
Regulation
Division of insurance

By: _____

Joseph Torti III, Superintendent of Insurance

Dated: October 4, 2010



**Department of**
**R**evenue &
**egulation**

Division of Insurance

445 East Capitol Avenue
Pierre, South Dakota 57501-3185
Phone: 605-773-3563
Fax: 605-773-5369

## PARTICIPATING REGULATOR ADOPTION

### ALLSTATE MULTI-STATE MARKET CONDUCT REGULATORY AGREEMENT

On behalf of the South Dakota Division of Insurance I, Merle Scheiber, hereby adopt, agree, and approve this Agreement.

South Dakota Division of Insurance

By: _____     Date: /0 -4-/0

Merle Scheiber, Director

# EXHIBIT H

### PARTICIPATING REGULATOR ADOPTION

On behalf of the Utah Insurance Department, I, Neal T. Gooch, hereby adopt, agree, and approve

this Agreement.


Utah Insurance Department


By: _Neal T. Gooch_

Neal T. Gooch, Commissioner,

Printed Name: Neal T. Gooch

Date_ 9/29/2010_

COMMONWEALTH OF VIRGINIA

STATE CORPORATION COMMISSION

IN THE MATTER OF:

ALLSTATE INDEMNITY COMPANY
ALLSTATE INSURANCE COMPANY
ALLSTATE FIRE AND CASUALTY
    INSURANCE COMPANY
ALLSTATE PROPERTY AND CASUALTY
    INSURANCE COMPANY
DEERBROOK INSURANCE COMPANY
ENCOMPASS INDEMNITY COMPANY
ENCOMPASS INSURANCE COMPANY
ENCOMPASS INSURANCE COMPANY OF AMERICA
ENCOMPASS PROPERTY AND CASUALTY
    INSURANCE COMPANY
ENCOMPASS INDEPENDENT INSURANCE COMPANY
NORTHBROOK INDEMNITY COMPANY

CASE NO. INS-2010-00212

*Ex Parte*:  In the matter of Approval of a
Multi-State Regulatory Settlement Agreement
Between Allstate Insurance Company, *et al*.
And the Insurance Commissioners of the States of
Illinois, Florida, Iowa, and New York, for the
Virginia State Corporation Commission
Bureau of Insurance

<u>PARTICIPATING REGULATOR ADOPTION</u>

      ON THIS DAY this matter came before the Virginia Bureau of Insurance, State Corporation Commission ("Bureau") for consideration, and, upon consideration thereof, the Commissioner of Insurance finds:

1.   Allstate Indemnity Company, Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Deerbrook Insurance Company, Encompass Indemnity Company, Encompass Insurance Company, Encompass Insurance Company of America, Encompass Property and Casualty Insurance Company, Encompass Independent Insurance Company, and Northbrook Indemnity Company (collectively, "Allstate Companies"), are licensed to transact the business of insurance in the Commonwealth of Virginia.  As affecting the Commonwealth of Virginia, the Bureau has jurisdiction over the subject matter of this proceeding and the Allstate Companies;

2. In March 2009, the Insurance Commissioners from the State of Illinois joined with the Insurance Commissioners from the States of Florida, Iowa, and New York (collectively, "Lead Regulators") to call a multi-state market conduct examination of the Allstate Companies to review Allstate's handling of bodily injury claims from the mid-1990's to the present, including its use of computer systems to settle such claims, in particular, the use of the Colossus software program.

3. A settlement has been presented to the Bureau, the terms of which are set forth in a Regulatory Settlement Agreement ("Agreement") which has been signed by the Allstate Companies and the Lead Regulators. The Allstate Companies understand that they have a right to a hearing in this matter, and have agreed to waive such rights, in accordance with the Agreement.

4. The Bureau expressly adopts, agrees, and approves this Agreement as a fair and proper disposition of the matters addressed herein.

A COPY hereof shall be filed with the Clerk of the Commission and thereby placed in Case No. INS-2010-00212.

_Oct. 5, 2010_
Date

Alfred W. Gross,
Commissioner of Insurance
Bureau of Insurance
State Corporation Commission
Commonwealth of Virginia

2

## PARTICIPATING REGULATOR ADOPTION

On behalf of the State of Washington, Office of the Insurance Commissioner,

I, Mike Kreidler, hereby adopt, agree, and approve this Agreement.

Office of the Insurance Commissioner, State of Washington

By: _____

Mike Kreidler, Insurance Commissioner,

Printed Name: _Mike Kreidler_

Date: _September 23, 2010_

# EXHIBIT H

### Participating Regulator Adoption
### Multi-State Market Conduct Regulatory Agreement
### Allstate Insurance Companies and Affiliates Listed on Exhibit A

On behalf of the State of Wyoming Department of Insurance, I, Ken Vines, Commissioner, hereby adopt, agree, and approve this Agreement.

State of Wyoming Department of Insurance

By: _Keeth S. Vie_

Ken Vines, Commissiner

Printed Name: _Ken Vines_

Date _10/6/10_