**ROBERT WOJCIECHOWSKI,**

      **Plaintiff,**

**v.**                               **Case No: 8:14-cv-03176-MSS-TBM**

**ALLSTATE PROPERTY AND**
**CASUALTY INSURANCE,**

      **Defendant.**

_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of the Motion for Summary Judgment (Dkt. 38) ("Motion") filed by Defendant Allstate Property and Casualty Insurance, the Response in Opposition thereto (Dkt. 55) filed by Plaintiff, Robert Wojciechowski, and the Reply (Dkt. 56) filed by Allstate. Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Allstate's Motion for the reasons stated herein.

## I.    BACKGROUND

### a.  Procedural History and Status of the Case

Plaintiff, Robert Wojciechowski, brought this action against Defendant, Allstate, seeking damages under the Florida Civil Remedy Statute, Fla. Stat. § 624.155, and the Unfair Insurance Trade Practices Act, Fla. Stat. § 626.9541.[1] (Dkt. 1) Specifically, Mr. Wojciechowski contends that Allstate acted in bad faith in declining to settle his uninsured motorist ("UIM" or "UM") claim and engaged in unfair claim settlement practices in the

---

[1] The action was initially filed by both Mr. and Ms. Wojciechowski; however, the Court previously dismissed Ms. Wojciechowski's claim. (See Dkt. 22)

handling of the claim.  (Id.)  Allstate seeks summary judgment in its favor as to both claims, arguing that evaluating Allstate's conduct during the Civil Remedy Notice Cure Period, between January 6, 2012 and March 7, 2012, no reasonable jury could conclude that Allstate acted in bad faith because Mr. Wojciechowski's claims did not warrant a value of $230,000.[2]  (Dkt. 38 at 1)  Allstate argues that during the Civil Remedy Notice Cure Period the medical records showed that Mr. Wojciechowski was at maximum medical improvement ("MMI") with a zero-percent permanent impairment and had been released back to full duty.  (Id.)  Allstate contends that while there was a discussion of the possibility of surgery, no surgery had occurred or was scheduled and Mr. Wojciechowski had not treated in over five months at the time he served his Civil Remedy Notice on January 6, 2012.[3]  (Id.)  Allstate also asserts that it did not violate any of the statutory provisions in Fla. Stat. § 626.9541 cited by Mr. Wojciechowski and therefore did not engage in unfair settlement practices.  (Id. at 13, 25)  Mr. Wojciechowski disputes the foregoing contentions and argues that there are material issues of disputed facts that preclude summary judgment.  (Dkt. 55)

### b.  Questions before the Court

The Court must determine whether Allstate acted in bad faith in the handling of Mr. Wojciechowski's UIM claim.  To make this determination, the Court must address the following questions: 1) whether the medical information Allstate possessed during the Civil Remedy Notice Cure Period reasonably demonstrated that Mr. Wojciechowski's

---

[2] This $230,000.00 represents the total combined value of the $100,000 of the tortfeasor's policy limits, the $20,085 paid by worker's compensation for medical expenses, the $10,000 in personal injury protection benefits paid by Allstate, and the $100,000 of Allstate's policy limits.

[3] Mr. Wojciechowski served his Civil Remedy Notice on January 6, 2012.  (Dkt. 54 at ¶ 12)  The medical records show that his last treatment prior to serving the notice occurred on July 26, 2011 and was rendered by the pain management doctor, Dr. Nishin S. Tambay.  (Dkt. 35-6 at 17)

injuries warranted consideration of non-economic damages, based on a permanent injury or forthcoming surgery, that were sufficient to trigger his UIM policy limits; 2) whether the medical information Allstate possessed during the Civil Remedy Notice Cure Period reasonably showed that Mr. Wojciechowski's economic damages were sufficient to trigger his UIM policy limits; and 3) whether certain aspects of Allstate's claim handling process are evidence that it acted in bad faith.  The Court answers each of the foregoing questions in the negative.

The Court must also determine whether Allstate engaged in unfair claim settlement practices in the handling of Mr. Wojciechowski's claim.  The Court answers this question in the negative.  The relevant, undisputed facts are as follows.

### c.  Undisputed Facts

#### 1.  Facts from June 23, 2010 through November 18, 2011

On June 23, 2010, Robert Wojciechowski, a Pinellas County Sheriff, was on duty, driving in Clearwater, Florida, when he was involved in a motor vehicle accident caused by Gabrielle Granata.  (Dkt. 54 at ¶ 1) (the "Accident")  Mr. Wojciechowski claims he sustained injuries from the Accident.  (Id. at ¶ 1)

At the time of the Accident, Ms. Granata had bodily injury liability coverage for $100,000 per person through Kemper Insurance ("Kemper"), and Mr. Wojciechowski had personal injury protection ("PIP") benefits for $10,000 and UIM benefits for $100,000 through Allstate, auto policy number 96153806507/12 ("the Policy").  (Id. at ¶¶ 2-3)  Under the terms of the Policy, Allstate contracted to "pay those damages which an insured is legally entitled to recover from the owner or operator of an uninsured auto because of bodily injury sustained by an insured person, except that [Allstate] will not pay for

damages consisting of pain, suffering, mental anguish, or inconvenience unless the injury or disease is described in one or more of paragraphs (a) through (d) of Florida Statute 627.737(2) . . . . The bodily injury must be caused by the accident . . . . Bodily injury means physical harm to the body . . . ." (Id. at ¶ 3)

Mr. Wojciechowski's medical bills incurred as a result of the Accident were paid by Pinellas County under the worker's compensation benefits available through his job. (Id. at ¶ 4) The Pinellas County Risk Management worker's compensation file notes reflect that on October 1, 2010, Mr. Wojciechowski called complaining of neck pain. (Id. at ¶ 5) The file also discloses that Mr. Wojciechowski wanted to return to see Dr. Pigeon, he had made his own appointment, and he was still attending physical therapy for his neck. (Id.)

In a letter dated October 6, 2010, Mr. Castagliola advised Allstate that he represented Mr. Wojciechowski and apprised Allstate of the nature of Mr. Wojciechowski's claim. (Dkt. 38 at 2; Dkt. 1 at ¶ 17) In that letter, Mr. Castagliola requested that Allstate direct all inquiries concerning Mr. Wojciechowski through Mr. Castagliola's office. (Dkt. 54 at ¶ 6) Mr. Castagliola also requested that Allstate provide him with Mr. Wojciechowski's insurance coverage information and forward him a PIP application for Mr. Wojciechowski to sign. (Id. at ¶ 6; Dkt. 38-3) Allstate received this notice of the loss on October 13, 2010. (Dkt. 54 at ¶ 7) On October 15, 2010, Mr. Castagliola advised Allstate that Mr. Wojciechowski had sustained a rotator cuff tear, he had not worked for three months, and it was unknown whether he would require surgery. (Dkt. 54-1 at 54-55)

Plaintiff's claim was assigned to Allstate's UIM specialist adjuster, Michelle Desenti, and was described as a major injury. (Dkt. 54 at ¶ 9) On October 17, 2010, Ms.

Desenti sent to Mr. Wojciechowski's home address a claim acknowledgment letter advising him to call her with any questions, concerns, or additional information pertinent to his claim. (Id. at ¶ 9) On October 25, 2010, Allstate provided Mr. Castagliola with information regarding Mr. Wojciechowski's policy. (Dkt. 38-5) On October 28, 2010, Allstate sent a PIP application to Mr. Wojciechowski at his home address. (Dkt. 54 at ¶ 11) Shortly thereafter, on November 4, 2010, Allstate provided Mr. Castagliola with a certified copy of Mr. Wojciechowski's policy. (Dkt. 38-6)

On November 5, 2010, Mr. Castagliola responded to Kemper's request for medical documents and informed Kemper that it was his practice to wait for his client to reach MMI before providing a demand package, including all relevant medical data. (Dkt. 54 at ¶ 12) In the same response, Mr. Castagliola also informed Kemper that Mr. Wojciechowski had suffered a serious shoulder injury, may require surgery, was out of work for three months, and had returned to light duty. (Dkt. 38-7)

On November 11, 2010, Ms. Desenti noted that it appeared the tortfeasor's limits under the Kemper policy of $100,000 would be sufficient to cover Mr. Wojciechowski's injury. (Dkt. 38-2 at 44) Ms. Desenti also noted that she would continue to monitor the claim until Mr. Castagliola confirmed a UIM claim would not be presented. (Id.) She also indicated that she would follow up for medical authorization to order bills, records, and the worker's compensation file as well as follow up with Mr. Castagliola regarding the status of Mr. Wojciechowski's injury and the possibility of surgery. (Dkt. 54 ¶ 14; Dkt. 35-1 at 44)

On November 11, 2010, Ms. Desenti made a written request for Mr. Castagliola to provide a signed medical and wage authorization and provide information concerning the

following: physicians and medical care facilities in possession of relevant information about Mr. Wojciechowski; the name of Mr. Wojciechowski's employer and a letter from the employer confirming the amount of lost wages; medical bills and a report associated with treatment or services rendered for Mr. Wojciechowski's alleged injury; and any worker's compensation carrier claims. (Dkt. 54 at ¶ 15) That same day, Ms. Desenti called Mr. Castagliola's office and informed his assistant that she sent over the medical authorization to be completed. (Id. at ¶ 16) On December 3, 2010, Mr. Castagliola spoke with Joy Roe[4] from Allstate and advised her that he was not sure if Mr. Wojciechowski "had or is having arthro[scopic] surgery for rotator cuff tear at this time." (Id. at ¶ 19)

The Pinellas County Risk Management worker's compensation file indicates that on January 2, 2011, Mr. Wojciechowski injured his lower back making an arrest and went to the emergency room. (Id. at ¶ 17) The worker's compensation carrier stated that this incident would be handled as a new worker's compensation claim. (Id. at ¶ 17) In January 2011, Kemper's file notes indicate that the Pinellas County Risk Management adjuster told Kemper it would be another 30-45 days before Mr. Wojciechowski reached MMI as he was still being treated and attending physical therapy for his right shoulder. (Id. at ¶ 18)

On January 10, 2011, Allstate spoke with Mr. Castagliola regarding the release of Mr. Wojciechowski's records. (Id. at ¶ 20) Mr. Castagliola informed Allstate that he did not release records until the client reached MMI and he asked for the portion of the Policy that stated a release of records was part of the Policy. (Id. at ¶ 20) Allstate sent requests to Mr. Castagliola for signed authorizations on December 3, 2010; December 16, 2010;

---

[4] Ms. Roe's specific role is unspecified in the record.

and January 11, 2011; and cited to the relevant policy provision. (<u>Id.</u> at ¶ 21) On February 1, 2011, Ms. Roe called Mr. Castagliola's office and spoke with Lindsay Castellano, Mr. Castagliola's secretary. (<u>Id.</u> at ¶ 22; Dkt 41 at 9:2-5) Ms. Castellano advised that Mr. Wojciechowski was still being treated, they did not have provider information, and they were not aware of any surgeries having been performed or scheduled. (<u>Id.</u>)

On February 11, 2011, Allstate again requested the signed authorizations and reserved its right to assert a defense of no coverage under the policy due to the failure to provide the authorizations. (Dkt. 54 at ¶ 18) On March 14, 2011, Ms. Desenti spoke with Mr. Castagliola's assistant, who said she was unsure if Mr. Wojciechowski had surgery but that he was still being treated. (<u>Id.</u> at ¶ 25) Ms. Desenti told the assistant the reservation of rights would be rescinded upon receipt of signed authorizations. (<u>Id.</u>) That same day, Ms. Desenti wrote Mr. Castagliola's office asking for a signed medical authorization and stating "[w]e continue to monitor Mr. Wojciechowski's claim. We are currently investigating under a reservation of rights due to failure to provide a medical authorization and provider information". (<u>Id.</u> at ¶ 26)

Ms. Desenti's March 15, 2011 file notes state that Ms. Desenti and Kemper's adjuster reviewed information received from the worker's compensation carrier. (<u>Id.</u> at ¶ 27) This information showed that as of January 2011, Plaintiff's medical expenses were only $4,800, he had no lost wages, and he had not had surgery. (<u>Id.</u> at ¶ 27) The notes reflect that Kemper's adjuster agreed that even with shoulder surgery the claim would not exceed Kemper's limits. (<u>Id.</u> at ¶¶ 27-28) After this conversation, Ms. Desenti closed the claim without payment, noting that Mr. Wojciechowski was still obtaining treatment, but

the injury appeared to be soft-tissue in nature. (Id. at ¶ 30) Allstate's Tampa Bay Casualty Office received the completed and signed authorizations on April 5, 2011. (Dkt. 35-9)

Between August and October 2011, Mr. Castagliola wrote to Mr. Wojciechowski's medical providers and requested his medical records and billing. (Dkt. 54 at ¶ 33) Kemper notified Allstate on October 17, 2011 that Mr. Castagliola said he would be sending the Demand Package soon and that Mr. Wojciechowski had not had shoulder surgery. (Id. at ¶ 32) On November 18, 2011, Mr. Castagliola sent a dual Demand Package to both Kemper and Allstate in which he included Mr. Wojciechowski's medical records and billing and requested that each insurer tender its policy limits of $100,000. (Id. at ¶ 33; Dkt. 35-6 at 6) The dual Demand Package stated that Kemper and Allstate had thirty (30) days to tender their policy limits and that Mr. Wojciechowski would not accept a settlement offer unless both Kemper and Allstate simultaneously tendered their respective limits. (Dkt. 35-6 at 6)

The demand letter stated that Mr. Wojciechowski had prior chronic intermittent neck pain and headaches but that the symptoms were well maintained and that prior to the Accident he was able to perform his job duties. (Dkt. 35-6 at 3) The demand letter also stated that an MRI taken after the Accident revealed a new cervical spine injury not present on the MRI taken prior to the Accident. (Id. at 4) With respect to past medical treatment related to the Accident, Mr. Castagliola represented that Mr. Wojciechowski had incurred medical bills in the amount of $20,085.44 and that Pinellas County Risk Management had instituted a statutory recovery lien in the amount $14,155.70 in connection with those medical bills.[5] (Id. at 6) Regarding future medical treatment, Mr.

---

[5] Fla. Stat. § 440.39(3)(a) permits an entity that pays worker's compensation benefits on behalf of a person injured by a third-party tortfeasor to recover a pro-rata share of the benefits paid if the injured party ultimately

Castagliola represented in the demand letter that Mr. Wojciechowski's injuries would exceed the combined policy limits of $200,000 available through Kemper and Allstate. (Dkt. 12-3; Dkt. 35-6 at 2, 6)  More specifically, Mr. Castagliola represented that

> [w]hile surgery has not been scheduled as[sic] this time, please consider that the immediate future medical treatment prescribed for Deputy Wojciechowsk[sic] consists of two shoulder surgeries at a cost of $35,000.00 each and a spinal fusion surgery at a conservative costs of $100,000.00 for a total of $170,000.00 in future surgery costs, excluding post surgery physical therapy, doctor visits, and testing.

(Id.)  Based on this representation, Mr. Castagliola requested payment of the tortfeasor's $100,000 policy limits through Kemper as well as the $100,000 UIM benefits through Allstate.  (Id.)

### 2. Summary of Medical Records Contained in Demand Package

The Demand Package included Mr. Wojciechowski's medical records, which detailed treatment dating from July 2010 through July 2011.  (Dkt. 35-6)  A summary of the medical records and findings are as follows.

Mr. Wojciechowski was being treated for neck and back pain.  (Id. at 31)  He had preexisting injuries to his cervical spine and two prior shoulder surgeries.  (Dkt. 38-11; Dkt. 35-6 at 15)  He had a pre-Accident cervical spine MRI taken on March 9, 2010.  (Dkt. 35-6 at 33)  He had a post-Accident cervical spine MRI taken on June 28, 2010.  (Id.)  His post-Accident cervical spine MRI taken on June 28, 2010 detailed "similar findings" as his MRI dated March 9, 2010.  (Id.)  Dr. Pigeon noted that his findings on July 12, 2010 were "consistent with [Mr. Wojciechowski's] prior study from [March 9, 2010], which predated his current work related injury" involving Ms. Granata.  (Id.)  Dr. Pigeon reported that Mr. Wojciechowski would be enrolled in physical therapy.  (Id.)  Dr. Pigeon reported on July

---

receives a judgment against or enters into a settlement with the third-party tortfeasor.

27, 2010 that Mr. Wojciechowski "will be advanced to full work duty" and "is essentially at MMI with no impairment rating." (Id. at 30)  Dr. Pigeon reported that "*if* surgery was required in the future, it may involve a C-5-C-6 [Anterior Cervical Discectomy Fusion ("ACDF")], *although this is not indicated in the current or foreseeable future.*"  (Id.) (emphasis added)

Mr. Wojciechowski returned to Dr. Pigeon on October 4, 2010, complaining that his symptoms had reoccurred and were severe.  (Id. at 28)  Dr. Pigeon stated that Mr. Wojciechowski would be enrolled in physical therapy.  (Id. at 29)  Dr. Pigeon reported that he would consider bilateral C5-C6 transforaminal epidural steroid injections if the symptoms remained and he also discussed operative treatment as a possible option, if necessary.  (Id.)  In December 2010, Mr. Wojciechowski discussed epidural steroid injections with Dr. Tambay.  (Id. at 13-14)  On December 10, 2010, Dr. Tambay noted that Mr. Wojciechowski was experiencing pain consistent with cervical radiculopathy and that this may be a result of new cervical disc disease.  (Id.)  Dr. Tambay recommended that Mr. Wojciechowski undergo further testing to rule out cervical radiculopathy and recommended that he treat with orthopedic surgeon Dr. Cottrell.  (Id.)  Dr. Cottrell took X-rays of Mr. Wojciechowski on January 7, 2011, which showed normal bilateral shoulders. (Id. at 8)  Treatment with Dr. Schwartz on January 10, 2011 showed mild to moderate carpel tunnel and no electrodiagnostic evidence for ulnar nerve entrapment syndrome and no evidence of cervical radiculopathy.  (Id. at 16)  Dr. Cottrell took an MRI on January 21, 2011, which showed bilateral shoulder impingement syndrome.  (Id. at 10)  Dr. Cottrell suggested physical therapy and advised Mr. Wojciechowski he could be on full duty.  (Id.)

In February 2011, Mr. Wojciechowski treated with Dr. Tambay and received several cervical injections. (Id. at 19)   An MRI taken on March 14, 2011 did "not show any major changes" compared to the MRI dated March 9, 2010 taken prior to the Accident, and Dr. Pigeon noted there is clearly an issue with C5-C6 level. (Id. at 23)   Dr. Pigeon prescribed transforaminal epidural steroid injections. (Id.)  Dr. Pigeon then noted that he "re-discussed operative treatment, which he stated may involve C5-C6 [Anterior Cervical Discectomy Fusion]", and noted that Mr. Wojciechowski was "very reticent for any operative treatment." (Id.)  Dr. Pigeon released Mr. Wojciechowski to full work duty, as he had been doing for the past several months and advised him to return in "six weeks for reassessment and for re-discussion regarding operative treatment as appropriate. The patient understands and agrees." (Id.)  This was the last record by Dr. Pigeon. (Id.) On July 26, 2011, Mr. Wojciechowski received injections by Dr. Tambay, who noted that Mr. Wojciechowski had good initial pain relief. (Id. at 17)  This concluded the record of treatment submitted to Allstate in the Demand Package.

### 3. Facts from November 22, 2011 through June 19, 2013

Allstate received the Demand Package on November 21, 2011 and, on November 22, 2011, pulled the closed file from the file room. (Dkt. 54 at ¶ 35)  On December 8, 2011, Kemper's file notes and Allstate's file notes reflect a call in which Kemper told Ms. Desenti it was tendering Kemper's policy limits. (Dkt. 54 at ¶ 36)  On December 12, 2011, at 10:26 a.m., Allstate received a fax from Mr. Castagliola informing it that Kemper tendered its policy limits of $100,000, and it was Mr. Wojciechowski's desire to accept the offer. (Dkt. 54-12 at 2; Dkt. 54 at ¶ 37)  Mr. Castagliola also requested that Allstate waive its subrogation rights against the tortfeasor. (Id.)  On December 16, 2011, evaluation

consultant Carolyn Mitchell reviewed and evaluated all the medical records, re-ran Colossus, and entered her evaluation notes. (Dkt. 54 at ¶ 39; Dkt. 38-15; Dkt. 39 at 5:18-19) Thereafter, Ms. Desenti sent a letter to Mr. Castagliola, which stated

> During the course of treatment after the accident, Mr. Wojciechowski was placed at MMI with 0% PPI rating until he aggravated his condition when making an arrest. It would appear that all treatment after July 27, 2010 would be unrelated to the accident. We do not have a copy of the worker's compensation payout. At this time, our review indicates there is no UM exposure and the value of [the] claim falls within the tort limits of the $100,000.00. Should you have additional information you would like to present we will gladly review and consider.

(Id.)

On December 26, 2011, Mr. Wojciechowski accepted the $100,000 bodily injury benefits from Kemper and executed a Release of all Claims arising out of the Accident. (Dkt. 12-1) Mr. Castagliola wrote a letter on January 6, 2012 to Allstate, demanding payment of the $100,000 UIM policy benefits within 30 days, contending that "even though Officer Wojciechowski was prematurely placed at MMI on July 27, 2010, one month after the traffic incident, in October 2010, his symptoms reoccurred and they were quite severe. In October 2010, his treatment for the injuries generated by the traffic accident of June 23, 2010 resumed." (Dkt. 54-13 at 2) Mr. Castagliola also enclosed his office's medical summary, which did not summarize any additional medical records beyond those already provided to Allstate. (Dkt. 38-16; Dkt. 54-13 at 2) He also enclosed a copy of the workers compensation payout. (Id.) Mr. Castagliola then filed a Civil Remedy Notice (alternatively referred to at times as "CRN") on January 6, 2012 against Allstate concerning his claim for the UIM benefits. (Dkt. 54 at ¶ 42)

On February 1, 2012, Mr. Castagliola sent a letter to Allstate stating that he had negotiated with Pinellas County and it had agreed to reduce its statutory lien of $14,155.70 for medical expenses paid on Mr. Wojciechowski's behalf to $10,000.00 as a

full, complete, and final settlement of the worker's compensation lien.  (Dkt. 38-18)  In that letter, Mr. Castagliola stated that although he had previously advised that Mr. Wojciechowski intended to reserve the rights to his PIP benefits for a later time, Mr. Wojciechowski was now demanding that Allstate tender the $10,000.00 in PIP benefits so that he could satisfy the worker's compensation lien.  (Id.)

On February 2, 2012, Allstate adjustor John Allen wrote to Mr. Castagliola's office to advise him that Mr. Allen was reassigned to the claim.  (Dkt. 54 at ¶ 43)  Mr. Allen advised that after re-evaluating the medical records and bills submitted by Mr. Castagliola in the January 6, 2010 demand letter he also concluded that there was no UIM exposure to Allstate.  (Id.)  On February 27, 2012, Mr. Allen spoke to Mr. Castagliola's paralegal regarding whether Mr. Wojciechowski had, or was scheduled for, surgery.  (Id. at ¶ 44) Mr. Castagliola's paralegal informed Mr. Allen that Mr. Wojciechowski still had the recommendation but no surgery had occurred nor had a date for surgery been set.  (Id.) Also, on February 27, 2012, Allstate responded to the Civil Remedy Notice and again advised that its evaluation showed that the injury claim was within the tortfeasor's policy limits of $100,000 based on the medical records and bills submitted. (Dkt. 1-4 at 1) Allstate did however tender the $10,000.00 in PIP benefits to Mr. Wojciechowski as complete, full, and final settlement of the worker's compensation lien.  (Dkt. 38-2 at 27; Dkt. 55 at 20-21)  Mr. Wojciechowski accepted this tender without reservation, thus eliminating any out-of-pocket loss on the then outstanding medical expenses and the associated lien.  (Dkt. 38-18; Dkt. 38-2 at 27; Dkt. 55 at 20-21)

On November 21, 2012, Allstate reassigned the claim to Mr. Prevot.  (Dkt. 54 at ¶ 46)  His file notes for that day state that he called Mr. Castagliola's office and a legal

assistant told him that to the best of her knowledge Mr. Wojciechowski had not had surgery and she did not believe there was any recent treatment information. (Id.) Mr. Prevot asked the legal assistant to forward records if the treatment status changed significantly and he closed the file. (Id.)

On June 10, 2013, Allstate received a letter from Mr. Castagliola which contained updated medical information, including a cervical surgery report from Dr. Pigeon showing that Mr. Wojciechowski underwent surgery on March 29, 2013. (Id. at ¶ 47; Dkt. 38-20) This letter was sent more than six and half months after Allstate's last contact with Mr. Wojciechowski or his counsel and more than fifteen (15) months after the Civil Remedy Notice Cure Period ended. On June 18, 2013, Allstate pulled the closed file and recommended tendering the UIM policy limits. (Id. at ¶ 48) Allstate sent a check in the amount of $100,000 and the proposed release to Mr. Castagliola on June 19, 2013. (Id.) Mr. and Mrs. Wojciechowski signed a UIM Release of Allstate on July 19, 2013 in consideration of the $100,000 UIM benefits. (Dkt. 12-5) The UIM Release provided that Allstate is released and discharged from any and all liability from contractual obligations for UIM coverage. (Id.) However, the Wojciechowskis inserted a clause in the Release that provided "nothing herein will be construed to release claims under Fla. Stat. 624.155 or 627.727(10)." (Id.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on

the substantive law applicable to the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  <u>Clark v. Coats & Clark, Inc</u>., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party.  <u>Fennell</u>, 559 F.3d at 1216 (citing <u>Welding Servs., Inc</u>., 509 F.3d at 1356).  A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case.  <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial.  <u>Porter v. Ray</u>, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  <u>Evers v. Gen. Motors Corp.</u>, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## III.  DISCUSSION

### A.  Insurance Bad Faith Claim

In Florida, a first-party bad faith claim arises when an insured sues its own insurance company for an improper denial of benefits.  <u>Cousin v. GEICO General Insurance Company</u>, 166 F. Supp. 3d 1290, 1297 (M.D. Fla. 2015) (citing <u>QBE Ins. Corp.</u>

v. Chalfonte Condominium Apartment Ass'n, Inc., 94 So. 3d 541, 546 n. 1 (Fla. 2012))
(internal citation omitted). A first-party bad faith action is a separate and distinct cause of
action from the underlying claim for UIM benefits and allows the insured to recover
damages in excess of the policy limits. Allstate Ins. Co. v. Jenkins, 32 So.3d 163, 164-
65 (Fla. 5th DCA 2010). An insurance company becomes liable for damages beyond the
policy limits when it fails to attempt "in good faith to settle claims when, under all the
circumstances, it could and should have done so, had it acted fairly and honestly toward
its insured and with due regard for her or his interests." Fla. Stat. § 624.155.

The determination as to whether an insured has acted in good faith is based on
the totality of the circumstances, which, *inter alia*, considers whether the insurer
investigated the facts surrounding the event, gave fair consideration to reasonable
settlement offers under the circumstances, and settled where possible if a reasonably
prudent person would have settled. Macola v. GEICO, 953 So. 2d 451, 455 (Fla. 2006)
(quoting Boston Old Colony Ins. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980). "[T]o fulfill
the duty of good faith, an insurer does not have to act perfectly, prudently, or even
reasonably. Rather, insurers must 'refrain from acting solely on the basis of their own
interests in settlement.'" Messinese v. USAA Cas. Ins. Co., 622 Fed. App'x 835, 839
(11th Cir. 2015)[6] (quoting State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So. 2d 55, 58
(Fla. 1995)). "Mindful of the insurer's duty of good faith, the justification for bad faith
jurisprudence is as a shield for insureds—not as a sword for claimants." Cousin, 166 F.
Supp. 3d at 1297 (internal quotations omitted).

---

[6] "Although an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R.
36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

**First-Party Bad Faith Civil Remedy Notice and Cure Period**

"In 1982, the Florida Legislature created a statutory first-party bad faith cause of action through the enactment of section 624.155." Fridman v. Safeco Ins. Co. of Illinois, 185 So. 3d 1214, 1220 (Fla. 2016) (citing Fla. Stat. § 624.155(1)(b)). "As a condition precedent to filing a civil action under section 624.155, 'the Florida Department of Financial Services and the authorized insurer must have been given 60 days' written notice of the violation.'" Id. (quoting § 624.155(3)(a), Fla. Stat. (2007)) (internal brackets omitted); see also Fla. Stat. § 624.05(1). "This notice is commonly referred to as the 'civil remedy notice.'" Id. "The statute further provides that '[n]o action shall lie if, within 60 days after filing notice, the damages are paid or the circumstances giving rise to the violation are corrected.'" Id. (quoting Fla. Stat. § 624.155(3)(d)). "This sixty-day window provides insurers with a final opportunity 'to comply with their claim-handling obligations when a good-faith decision by the insurer would indicate that contractual benefits are owed.'" Id. (quoting Talat Enters., Inc. v. Aetna Cas. & Sur. Co., 753 So. 2d 1278, 1284 (Fla. 2000)). See also Lane v. Westfield Ins. Co., 862 So. 2d 774, 779 (Fla. 5th DCA 2003) ("The purpose of the civil remedy notice is to give the insurer one last chance to settle a claim with its insured and avoid unnecessary bad faith litigation.").

Allstate argues that its actions taken during the Civil Remedy Notice Cure Period, January 6, 2012 to March 7, 2012, were not in bad faith because it timely reviewed the Demand Package received from Mr. Wojciechowski. Allstate argues that based on the available medical records it possessed during that pertinent time period, it did not act in bad faith when it determined Mr. Wojciechowski's claim was within the tortfeasor's limit and declined to tender its $100,000 policy limits in response to the demand. The Court

agrees.

In a recent case that is factually very similar to this case, the Eleventh Circuit held that the "possibility of surgical intervention" is insufficient to provide notice to an insurer of a permanent injury; therefore, the insurer did not act in bad faith for refusing to tender policy limits during the CRN cure period for amounts in excess of established economic damages. Cadle v. GEICO General Insurance Company, 838 F.3d 1113 (11th Cir. 2016).

In Cadle, Ms. Cadle was injured in a car accident on July 27, 2007. In Ms. Cadle's demand letter, issued on June 3, 2008, she requested her UIM policy limits of $75,000 and included her medical records. Id. at 1116. That same day, GEICO noted that she had not been designated as having a permanent injury and offered her $1,000 to settle her claim. Id. On September 17, 2008, Ms. Cadle filed her CRN in which she advised that "she was still under the care of her treating physician and a neurosurgeon with whom she had discussed surgical intervention . . . ." Id. at 1117. Prior to the CRN cure period, Ms. Cadle had not received any treatment for several months. Id. During the CRN cure period, Ms. Cadle did not produce any medical records establishing permanency, and GEICO did not increase its offer again, noting there had been no designation of a permanent injury. Id. On December 15, 2009, over a year after the CRN cure period ended, and unbeknownst to GEICO, Ms. Cadle underwent surgery. Id. Ultimately, Ms. Cadle filed suit against GEICO alleging bad faith, and the jury returned a verdict in her favor. Id. at 1118.

Notwithstanding the jury verdict, the district court determined that Ms. Cadle "was only entitled to economic damages, which indisputably were not $75,000 and therefore Ms. Cadle was not entitled to, as a matter of law, the UM policy limits." Id. at 1120 (internal

brackets omitted). Regarding the amount of any economic damages to which she was entitled, the district court found that Ms. Cadle did not have any out-of-pocket expense because her medical expenses had been covered. Id. Regarding any alleged failure by the insurer to consider Ms. Cadle's possible surgery in evaluating her claim, the district court noted that "*[t]here is nothing in that record that says GEICO was on notice that she had to have surgery. It's just not there.*" Id. at 1118 (emphasis in original). The district court entered judgment as a matter of law in GEICO's favor, concluding that although Ms. Cadle underwent surgery in December 2009, "no evidence supported [Ms.] Cadle's claim GEICO was aware or should have known that she had a permanent injury prior to January 2010 when [Ms.] Cadle's attorney informed GEICO of her December 2009 surgery." Id. at 1120 (internal quotation marks and brackets in original omitted).

The Eleventh Circuit affirmed the district court's decision, stating that

> at no time during the cure period did [Ms.] Cadle produce to GEICO medical evidence of the permanency of her injury. Noneconomic damages are available under an insurance policy only if the plaintiff incurs a permanent injury," which must be established "within a reasonable degree of medical probability" within the cure period.

Id. at 1126 (quoting Fla. Stat. § 627.737(2)(b)). The Eleventh Circuit, quoting the district court, reiterated

> Despite numerous opportunities, [Ms.] Cadle's attorney never provided any evidence of a permanent injury and never even attempted to address the threshold issue [of permanent injury], except to note that his client was considering surgical intervention. This possibility of surgical intervention is not, however, notice of permanent injury. Absent evidence of a permanent injury, there was no basis for GEICO to value [Ms.] Cadle's UM claim at or above $75,000. Accordingly, *there was no credible evidence presented to the jury to support a finding of bad faith.*

Id. at 1127 (emphasis in original) (brackets in original omitted).

Also, in <u>Harris v. GEICO General Ins. Co.</u>, Ms. Harris was injured in an automobile

accident in which an underinsured motorist was at fault. 961 F. Supp. 2d 1223, 1225 (S.D. Fla. 2013), aff'd, 619 Fed. App'x 896, 898–99 (11th Cir. 2015). Ms. Harris was insured under a GEICO UIM policy in the amount of $100,000 at the time of the accident. Id. On August 13, 2009, Ms. Harris made a formal demand for the UIM policy limits and enclosed medical bills totaling $34,111.76. Id. On August 25, 2009, GEICO offered $17,156.47 to settle the matter. Id. at 1226. On September 1, 2009, Ms. Harris served a CRN pursuant to Fla. Stat. § 624.155, which stated her medical bills exceeded $34,000, she incurred car property damage of $4,000, and her injuries were permanent. Id. On September 15, 2009, Ms. Harris underwent a percutaneous discectomy.[7] Id. On October 1, 2009, GEICO raised its offer to $25,000, stating that it believed Ms. Harris had undergone a questionable medical procedure. Id. On October 6, 2009, Ms. Harris requested medical expenses in the total amount of $75,305. On October 8, 2009, GEICO offered $30,000 to settle the claim. Id.

Ms. Harris filed a bad faith action on March 31, 2011, alleging that GEICO should have settled her claim during the statute's safe harbor period based upon the medical information available to GEICO at that time.[8] Id. at 1226. A jury returned a verdict in favor of Ms. Harris. Id. Notwithstanding the jury verdict, the court entered judgment as a matter of law in GEICO's favor. Id. at 1232. The court noted that under Florida law an insured may recover only economic damages where the injuries constitute a serious injury within the meaning of Fla Stat. 627.737(2). Id. at 1230. The court further noted that an

---

[7] The court noted that percutaneous discectomies are brief outpatient procedures performed in about fifteen minutes and that insurance claims based on percutaneous discectomies usually settle for between $4,000 and $6,000. Id. at 1226.

[8] Prior to the filing of the bad faith action, Ms. Harris filed suit in state court on the underlying liability action. During the pendency of that action she underwent spinal fusion surgery that more than quadrupled her medical costs. On April 20, 2010, GEICO tendered the policy limits. Ms. Harris rejected this tender. The ensuing trial resulted in a jury verdict in the amount of $336,351. Id.

insured may recover non-economic damages when there is "permanent injury within a reasonable degree of medical probability." Id. Ms. Harris argued that "[GEICO] ignor[ed] [her counsel's] later testimony that she anticipated—and correctly at that—that [Ms. Harris] would sustain a permanent injury arising from the subject car crash." Id. at 1231. (internal quotations omitted). The court rejected this argument explaining that in Florida "the entitlement to non-economic damages does not turn on whether she or her counsel believes or anticipates a finding of permanent injury. Rather, the standard is whether the injury and the permanency thereof can be established within a reasonable degree of medical probability." Id. In the absence of that necessary medical evidence, the court entered judgment in favor of GEICO, noting that Ms. Harris had not shown that she sustained a permanent injury within a reasonable degree of medical probability. Id.

Here, the Court likewise finds that within the Civil Remedy Notice Cure Period ("Cure Period"), i.e. from January 6, 2012 to March 7, 2012, Mr. Wojciechowski did not demonstrate within a reasonable degree of medical probability that he had suffered a permanent injury. As such, Allstate"s refusal to tender the $100,000 UIM policy limits during the Cure Period, which was based on the medical records it possessed and the fact that Mr. Wojciechowski incurred no out-of-pocket expenses, was not made in bad faith.

### a. Non-economic Damages were not Warranted

The Court further finds that Mr. Wojciechowski's injuries did not warrant consideration of non-economic damages in this case. Florida Statute § 627.737(2) allows for the recovery of non-economic damages upon a showing of certain serious impairments. In this case, the only serious impairment at issue requires a showing of a

permanent injury, other than scarring, within a reasonable degree of medical probability. Fla. Stat. § 627.737(2). On the facts on this record, there is no evidence to suggest that non-economic damages should have triggered Mr. Wojciechowski's UIM policy limits.

More specifically, the evidence shows that during the Cure Period the information provided to Allstate reflected that Mr. Wojciechowski had no such permanent injury; rather, he had been placed at maximum medical improvement with an impairment rating of zero, and his post-Accident cervical MRIs taken June 28, 2010 and again March 14, 2011 did not reflect any significant changes from his pre-Accident MRI taken March 9, 2010.

It appears that Mr. Wojciechowski contends that Dr. Pigeon prematurely placed him at MMI and mistakenly, prematurely assigned him an impairment rating of zero. The fact that he now contends this placement and assignment were made in error is unavailing. The Court evaluates an insurer's good faith based on the evidence that informed the insurer's decision during the Cure Period. If it is true that the assignment and placement were mistakenly made, there is no evidence in the record that Allstate's reliance on the absence of a permanent impairment rating of some relevant degree was in bad faith. More specifically, Plaintiff offers no evidence that Allstate would have known the assessment was a mistake. See Vest v. Travelers Ins. Co., 753 So. 2d 1270, 1275 (Fla. 2000) ("The insurer has a right to deny claims that it in good faith believes are not owed on a policy. Even when it is later determined by a court or arbitration that the insurer's denial was mistaken, there is no cause of action if the denial was in good faith."); Worsham v. Provident Companies, Inc., 249 F. Supp. 2d 1325, 1343-44 (N.D. Ga. 2002) (finding that insurer's reliance on independent medical examinations that insured argued

contained errors was not unreasonable and therefore could not support insured's claim of entitlement to bad faith penalties).

Mr. Wojciechowski alternatively contends that the fact that a surgical recommendation had been made would suffice to establish a permanent injury. (Dkt. 55 at 5, 11, 13) In this regard, he argues that Allstate had knowledge of this permanent injury during the Cure Period because Mr. Castagliola expressed in his demand letter that Dr. Pigeon discussed that Mr. Wojciechowski could be a candidate for operative treatment if conservative care failed. (Id.) He argues that Allstate ignored Dr. Tambay's notes that based on Mr. Wojciechowski's complaints of pain and the level and the location thereof, he had new symptoms possibly consistent with cervical radiculopathy. (Id.) He also argues that Mr. Castagliola stated in the demand letter that Dr. Tambay, the pain doctor, sent Mr. Wojciechowski back to Dr. Pigeon to discuss whether he was a surgical candidate because pain treatment, such as epidural steroid injections, had not yet provided satisfactory relief. (Id.)

While Mr. Castagliola claims that Dr. Pigeon thought Mr. Wojciechowski would be a good candidate for surgery, the positions argued by Mr. Castagliola are primarily premised on Mr. Wojciechowski's subjective complaints of pain. Notably, the Florida Supreme Court has held that subjective complaints may be evidence of the existence of a physical injury but "a mere recitation of the plaintiff's subjective complaints of pain is insufficient to prove a permanent injury-the plaintiff must also present expert medical testimony to establish the existence and permanency of the alleged injury." City of Tampa v. Long, 638 So. 2d 35, 38 (Fla. 1994). By way of example, Dr. Tambay's notes indicate that based on Mr. Wojciechowski's subjective complaints of pain he may have symptoms

consistent with cervical radiculopathy. (Dkt. 55 at 11; Dkt. 35-6 at 14) But further testing showed normal bilateral shoulders with no acute findings (Dkt. 35-6 at 11), no ulnar nerve entrapment syndrome, and no cervical radiculopathy (Dkt. 35-6 at 16). The testing only revealed bilateral shoulder impingement syndrome and for this Mr. Wojciechowski was again released to full duty and prescribed physical therapy. Thus, none of the objective information in the medical records demonstrated a permanent injury within a reasonable degree of medical probability or indicated that surgery was impending or foreseeable in the near future.

Although expressed by Mr. Castagliola in the demand letter, Dr. Pigeon's notes make no mention of future surgery concerning Mr. Wojciechowski's shoulders. The Parties dispute whether Dr. Pigeon "recommended" surgery in his March 22, 2011 evaluation. While Dr. Pigeon's notes on that date state that he "discussed" operative treatment concerning Mr. Wojciechowski's cervical spine he never used the term "recommend" anywhere in his reports. Viewing this evidence in a light most favorable to Mr. Wojciechowski, even if the Court were to accept Dr. Pigeon's last notation as a "recommendation" for surgery, it could not support a finding that Allstate acted in bad faith based on the facts of this case.

The Eleventh Circuit has held that the "possibility of surgical intervention is not . . . notice of permanent injury." Cadle, 838 F.3d at 1127. The evidence shows that Dr. Pigeon had discussed the option of surgery but no surgery was imminent or even foreseeable in the near future, relative to the Cure Period. In fact, the surgery option was discussed and was apparently rejected at the time as Mr. Wojciechowski expressed extreme reticence to undergo surgery. (Dkt. 35-6 at 23) In this regard, on March 22,

2011, Dr. Pigeon stated for Mr. Wojciechowski to return "in six weeks for reassessment and for re-discussion regarding operative treatment as appropriate. [Mr. Wojciechowski] understands and agrees." (Id.) The evidence shows that Mr. Wojciechowski did not return in "six weeks for reassessment and for re-discussion." In fact, the medical records show that Mr. Wojciechowski did not return to Dr. Pigeon at all until January 21, 2013, which was more than a year after Mr. Castagliola issued the CRN on January 6, 2012 and well after the Cure Period expired on March 7, 2012.[9] (See Dkts. 35-6, 50-7, 38-19)

Therefore, all Allstate was left with was a notation that Mr. Wojciechowski did not want to have surgery and that he and Dr. Pigeon were to re-discuss treatment options in six weeks. That "re-discussion" never occurred during the Cure Period and thus to that point there was only a possibility of surgery. But, as the Eleventh Circuit explained, the possibility of surgery is not notice of surgery. Consequently, Allstate could not have been on notice of his surgery prior to Mr. Wojciechowski's serving the CRN in January 2012. In fact, the medical records showed that Mr. Wojciechowski had not received any treatment from any provider since July 26, 2011, which was several months before Allstate's receipt of the Civil Remedy Notice.

Nor could Allstate have been on notice of any surgery prior to the expiration of the Cure Period. Indeed, during the Cure Period, Allstate corresponded with Mr. Wojciechowski multiple times and further inquired whether Mr. Wojciechowski had undergone surgery. To this inquiry, Mr. Castagliola's office confirmed that no surgery had occurred or been scheduled. At the expiration of the Cure Period in March 2012, Mr.

---

[9] Based on the medical records, Mr. Wojciechowski saw Dr. Tambay on July 26, 2011 (Dkt. 35-6 at 17), January 12, 2012 (Dkt. 50-7), and July 12, 2012 (Dkt. 50-7). Allstate was not informed about the latter two visits during the Cure Period.

Wojciechowski had not provided any additional medical records reflecting any additional treatment. In fact, on November 21, 2012, well after the expiration of the Cure Period, Mr. Castagliola's office continued to confirm that Mr. Wojciechowski had not had surgery and it did not believe there was any recent treatment information. The fact that Mr. Wojciechowski ultimately had surgery well more than a year after the expiration of the Cure Period does not alter the good faith nature of Allstate's evaluation during the Cure Period based on the medical records it reviewed at that time. During the relevant time between January 6, 2012 and March 7, 2012, the evidence showed that Dr. Pigeon, Mr. Wojciechowski's treating physician, and Dr. Cottrell, the orthopedic surgeon treating Mr. Wojciechowski, had released him to full work duty and no physician had assigned him as having a permanent injury. Therefore, Allstate cannot be said to have acted in bad faith in evaluating his claim solely on the basis of economic damages as demonstrated during the Cure Period.

### b. Economic Damages did not Trigger the UIM Policy Limits

In regard to economic damages, Mr. Wojciechowski's economic damages likewise did not trigger the UIM policy limits because he in fact had incurred no out-of-pocket economic damages. The only economic damages he had incurred at the time the Civil Remedy Notice was served were the $20,085.44 in medical expenses paid by Pinellas County, which were reduced to $14,155.70 and compromised further to $10,000 in the form of a worker's compensation lien. (Dkt. 38-18) It is undisputed that Allstate tendered the $10,000 in PIP benefits as a full, complete, and final settlement of the $10,000 worker's compensation lien. It is undisputed that Kemper had tendered its $100,000 policy limits and Mr. Wojciechowski had accepted that tender. Mr. Wojciechowski

concedes that he sustained no lost wages damages because the sheriff's office continued to pay him his salary. As a result of the foregoing, Allstate replied to the Civil Remedy Notice on February 27, 2012, informing Mr. Wojciechowski that it had a difference of opinion concerning the valuation and causation[10] of his claims but it would consider additional information he wanted to submit that might affect its evaluation. Mr. Wojciechowski failed to provide any additional information to Allstate during the Cure Period. Therefore, Allstate did not act in bad faith in determining that Mr. Wojciechowski's claim was within the $110,000 Kemper policy limits and PIP benefits that had already been offered to and accepted by him.

Indeed, in his Response to the instant motion, Mr. Wojciechowski acknowledges that there are no economic damages at issue and states that if this case were to go to trial, "on the issue of damages [he] will submit to the jury only his claims for past and future *non-economic losses as supported by testimony on causation and permanency.*" (Dkt. 55 at 20) (emphasis added)

In this regard, Mr. Wojciechowski would seek to establish Allstate's knowledge of a permanent injury during the Cure Period by showing that Allstate had notice of Mr. Wojciechowski's surgery. The Court has already addressed this notion. The Court next turns to whether certain aspects of Allstate's claim handling procedures support a finding of bad faith.

---

[10] Bearing on the issue of causation was that based on the medical records, it appeared that the spinal issue at the C5-C6 level for which Dr. Pigeon discussed operative treatment predated the car Accident involving Ms. Granata. This was evidenced by Dr. Pigeon's repeated findings that each post-Accident MRI was similar to, consistent with, and showed no major changes when compared with, the pre-Accident MRI. Additionally, on January 2, 2011, subsequent to and unrelated to the car Accident with Ms. Granata, Mr. Wojciechowski suffered another injury to his lower back while making an arrest for which worker's compensation assigned a new claim.

### c. Allstate's Claim Handling Procedures

### i. Medical Authorizations, Records, and Independent Medical Examination

Mr. Wojciechowski argues that certain aspects of Allstate's claim handling procedures could constitute bad faith. In particular, Mr. Wojciechowski argues that there is evidence of bad faith based on Allstate's failure to use the medical authorizations, make additional inquiries, keep thorough records, or request an independent medical examination. These arguments are without merit based on the facts of this case.

The district court in <u>Cadle</u> rejected Ms. Cadle's similar arguments that "GEICO should have investigated the matter more fully" or that "GEICO should not have relied on [Ms. Cadle's] attorney to provide it with complete medical records" or that GEICO should have "requested an independent medical examination of Mrs. Cadle." No. 6:13-cv-1591-Orl-31GJK, at *5 (M.D. Fla. Feb. 24, 2015), aff'd 838 F.3d 1113 (11th Cir. 2016). As the court explained, "the insurers duty does not go this far." <u>Id.</u> To the contrary, the court noted

> Reliance on the documents provided by and representations made by [Cadle's] lawyer cannot amount to bad faith, and [Cadle] has cited no authority to the contrary. Rather, the insurer is entitled to rely on the documents provided by [Cadle's] counsel, and the representations made by him concerning his client's claim. Moreover, there is no evidence that such additional investigations would have produced a different result.

<u>Id.</u>

Similarly, here, the evidence shows that Mr. Castagliola personally requested Mr. Wojciechowski's medical records and submitted them with his Demand Package received by Allstate on November 21, 2011. Mr. Castagliola also submitted a summary of those same medical records on January 9, 2011, the day Allstate received the Civil Remedy Notice. Upon receipt of the medical records, and during the Cure Period, Allstate followed

up with Mr. Castagliola, advising him that based on the medical records and bills submitted by Mr. Castagliola's office, Allstate continued to evaluate Mr. Wojciechowski's claim within the tortfeasor's limits of $100,000 such that there was no UIM exposure at the time. On February 27, 2016, also within the Cure Period, Allstate followed up with Mr. Castagliola's office and asked if Mr. Wojciechowski had undergone surgery or if surgery was scheduled. Having received no documentation of significant changes regarding Mr. Wojciechowski's medical treatment, Allstate, on February 27, 2012, responded to the Civil Remedy Notice advising that its valuation of his injuries was within the $100,000 Kemper policy limits previously tendered to him.

Thus, on this record, the Court finds that it was not bad faith for Allstate to rely on representations from Mr. Castagliola and/or Mr. Castagliola's office that Allstate was provided all of Mr. Wojciechowski's medical records needed for it to make a determination. Notably, Mr. Wojciechowski has not provided any evidence showing additional medical tests or records that Allstate would have uncovered had it used the medical authorizations or ordered an independent medical examination that would have significantly impacted Allstate's valuation of his claim. Likewise, even if it could be proven that Allstate failed to keep more thorough records, this failure at most could constitute negligence, but it could not support a finding of bad faith on the facts of this case. Additionally, even if it could be shown that Allstate did not act perfectly or prudently in this case, it need not do so, it just must not act solely in bad faith. See Messinese, 622 Fed. App'x at 839 ("[T]o fulfill the duty of good faith, an insurer does not have to act perfectly, prudently, or even reasonably.") (internal quotation marks omitted).

### ii. Allstate's Closing the File and Use of Colossus

Mr. Wojciechowski also argues that Allstate's closing out of his file and its purported misuse of the Colossus are evidence of bad faith. The Court finds these contentions unavailing. There is no evidence to suggest that either of these asserted actions had any impact on the evaluation of Mr. Wojciechowski's claim. Specifically, the evidence shows that Allstate continued to update Mr. Wojciechowski's file with new information and conduct new evaluations when warranted.

Further, the evidence shows that Allstate did not rely solely on the Colossus in evaluating Mr. Wojciechowski's claim. Rather, Allstate also relied on the assessments by its adjusters and evaluation consultants to make a determination. By way of example, the Colossus still showed that Mr. Wojciechowski's claim was within the $100,000 tortfeasor's insurance limits even after Allstate received the updated medical records concerning his cervical surgery in June of 2013. (Dkt. 38-21) Allstate tendered the $100,000 UIM benefits notwithstanding.

Ultimately, the evidence shows that during the Cure Period, Mr. Wojciechowski was at MMI, no doctor had designated him as having a permanent injury, he was released to full duty, he had no out-of-pocket economic damages, he had received the $100,000 tortfeasor's policy limits, no surgery was scheduled in the near future, and the medical records reflected that he had not treated in several months. For those reasons, the Court finds as a matter of law that Allstate did not act in bad faith by declining to tender the $100,000 UIM policy limits during the Cure Period based on the medical records during that pertinent time. Accordingly, Allstate's motion for summary judgment as to Count I is **GRANTED**.

### B. Unfair Claim Settlement Practices

In Count II, Mr. Wojciechowski asserts an Unfair Claim Settlement Practices cause of action under Florida Statutes, Section 626.9541, for:

> a. Failing to adopt and implement standards for the proper investigation of claims;
> b. Misrepresenting pertinent facts or insurance policy provisions;
> c. Failing to acknowledge and act promptly upon communications with respect to claims;
> d. Denying claims without conducting a reasonable investigation;
> e. Failing to affirm or deny full or partial coverage of claims or failing to provide a written statement that the claim is being investigated within 30 days after proof of loss statements have been completed;
> f. Failing to promptly provide a reasonable explanation in writing of the basis for a denial of a claim or offer of compromise;
> g. Failing to promptly notify the insured of any additional information necessary for processing the claim; and
> h. Failing to clearly explain the nature of the requested information and why the information is necessary.

(Dkt. 1 at 7) Allstate argues that it is entitled to summary judgment as to Count II because Allstate "did not deny Mr. Wojciechowski's claim, did not question the information about his medical bills and injuries disclosed by his lawyers, did not deny coverage, [and] did not fail to diligently investigate coverage, liability or damages . . . ." (Dkt. 38 at 13) Allstate further argues "there is no evidence that Allstate misrepresented pertinent facts or policy provisions or otherwise failed to respond to requests for coverage information." (Id. at 24)

The Court finds no evidence that Allstate violated any of the statutory provisions or otherwise engaged in unfair settlement practices. In fact, the evidence shows otherwise. The evidence shows that upon being notified of Mr. Wojciechowski's injury between October 6, 2010 and October 13, 2010, Allstate promptly undertook to investigate the claims. (Dkt. 54 at ¶¶ 7-8) Allstate attempted to communicate with Mr.

Castagliola on October 14, 2010 to obtain information regarding his client. (Id. at 8) In Mr. Castagliola's letter of representation, he requested Mr. Wojciechowski's insurance coverage information. (Id. at 6) Allstate responded via letter on October 25, 2010 and provided Mr. Wojciechowski's insurance information. (Dkt. 38-5) On November 4, 2010, Allstate provided Mr. Castagliola a copy of Mr. Wojciechowski's policy. (Dkt. 38-6) In point of fact, Mr. Castagliola testified that he believes he received everything he requested from Allstate and that nothing stood out in his mind as being missing. (Dkt. 41 at 15:3-16:3)

The evidence further shows that beginning in November 2010 and throughout the investigation of Mr. Wojciechowski's claim, Allstate communicated frequently with Kemper to facilitate the evaluation of Mr. Wojciechowski's UIM claim. (Dkt. 54; Dkt. 38-2) Allstate also communicated with Mr. Castagliola's office to request information it needed to further investigate and evaluate Mr. Wojciechowski's claim. By way of example, on November 11, 2010, Allstate requested that Mr. Castagliola provide:

> a. a signed medical and wage authorization.
> b. the name, address and phone number of all physicians and medical care facilities that have relevant information about Mr. Wojciechowski.
> c. the name, address and phone number of Mr. Wojciechowski's employer, along with a letter from the employer confirming the amount of lost wages.
> d. medical bills and a report including the ICD-9 diagnosis codes and/or CPT-4 procedure codes associated with treatment or services rendered for Mr. Wojciechowski's alleged injury.
> e. information on any worker's compensation carrier claims.

(Dkt. 54 at ¶ 15) Throughout the investigation Allstate continued to follow up with Mr. Castagliola concerning updates regarding Mr. Wojciechowski's treatment, signed authorizations, and other matters affecting Mr. Wojciechowski's claim. (Dkt. 54; Dkt. 38-2) At the conclusion of its investigation and evaluation during the Cure Period, Allstate

explained to Mr. Wojciechowski that it continued to value his claim within the tortfeasor's $100,000 policy limit. Therefore, Allstate explained that it would not tender the UIM policy limits due to issues with respect to valuation and causation. (Dkt. 1-4; Dkt. 38-15) Allstate however advised Mr. Wojciechowski that it would consider any additional information that he submitted that might assist in its efforts to properly resolve his claim. (Id.) Ultimately, Allstate immediately tendered the full UIM policy limits when it was presented with medical records that could reasonably trigger the UIM coverage. In this case, that did not occur until June 2013 when Mr. Castagliola presented records showing that Mr. Wojciechowski had undergone surgery.

Based on the foregoing, the Court concludes that Allstate did not violate any of the statutory provisions alleged in the Complaint and Allstate is entitled to summary judgment as to Count II as well. Accordingly, Allstate's motion for summary judgment as to Count II for Unfair Claims Settlement Practices is **GRANTED**.

IV.     **CONCLUSION**

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Defendant's Motion for Summary Judgment (Dkt. 38) is **GRANTED**.

2. The **CLERK** is **DIRECTED** to enter judgment for Defendant and against Plaintiff in accordance with this Order.

3. The **CLERK** is further **DIRECTED** to **TERMINATE** any pending motions and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida, this 27th day of December, 2016.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person